**In the Matter of Howard A. VOGEL, an Active Member of the Bar of this Court.**

**No. S–53-'77.**

District of Columbia Court of Appeals.

Jan. 13, 1978.

Howard A. Vogel entered an appearance pro se.

Fred Grabowsky, Bar Counsel, Washington, D.C., entered an appearance for The Disciplinary Board.

Before KELLY, GALLAGHER and HARRIS, Associate Judges.

PER CURIAM:

A disciplinary proceeding was initiated against Howard A. Vogel, a member of the bar of this court, charging him with a violation of Disciplinary Rule 1–102(A)(4) of the Code of Professional Responsibility. That rule prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.

A hearing was conducted before one of The Disciplinary Board's hearing committees. That committee recommended that Mr. Vogel be suspended from membership in the bar of this court for a period of six months, subject to a reduction to three months upon satisfaction of a repayment condition. (That was the discipline which had been recommended to the hearing committee by Assistant Bar Counsel.) The matter then proceeded to The Disciplinary Board pursuant to § 8 of Rule XI of our Rules Governing the Bar.

At that stage of the proceeding, Assistant Bar Counsel relied for the first time on the fact that respondent Vogel had been the subject of prior discipline, and urged The Disciplinary Board to recommend disbarment as the appropriate sanction. The Board thereafter prepared its Findings and Recommendations, which now are before us for consideration. The Board's recommendation to us is that Mr. Vogel should be suspended for nine months.

Respondent, whose health apparently is poor and who has been living in Florida, originally expressed his intention to file a brief challenging the Board's recommendation. We granted an extension of time for the submission of such a pleading, but respondent later requested that we consider

instead the brief which he had submitted originally to the hearing committee (and to the Board). He also formally waived oral argument before us. In light of that status, Bar Counsel—who previously had provided us with the full record and all prior pleadings—correctly saw no need to make any further submission to us.

We have studied the record, the pleadings, the Findings and Recommendation of Hearing Committee No. 4, and the Findings and Recommendations of The Disciplinary Board. We conclude that the Board correctly has analyzed the facts. We append its Findings and Recommendations hereto, and adopt its findings as our own. We also conclude that its recommendation of a nine-month suspension is an appropriate sanction. Accordingly, respondent Howard A. Vogel hereby is suspended from membership in the bar of this court for a period of nine months, to become effective upon the date of the issuance of this opinion.* Upon proof of his compliance with the relevant provisions of § 19 of Rule XI of our Rules Governing the Bar, respondent shall be deemed to be reinstated automatically to membership in the bar of this court after nine months.

## APPENDIX

### DISCIPLINARY BOARD OF THE DISTRICT OF COLUMBIA COURT OF APPEALS

Bar Docket No. 97–74B

### DISTRICT OF COLUMBIA BAR, PETITIONER

vs.

### HOWARD A. VOGEL, RESPONDENT

### FINDINGS AND RECOMMENDATIONS OF THE DISCIPLINARY BOARD

*Nature of the Case and Findings of Hearing Committee No. 4*

The Respondent in this proceeding is accused of violating Disciplinary Rule 1–

---

* As Mr. Vogel has been in Florida for some time, we need not follow our normal practice of setting a future date for the effectiveness of the suspension we order, for there appear to be no

102(A)(4), which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. The Hearing Committee has found that the Respondent's actions were dishonest and deceitful in that he made misrepresentations to his client in order to exact an additional retainer fee of $750.00 and then withdrew the amount of his fee from an escrow account without specific authority and contrary to the express terms of an agreement which he himself had dictated to a Credit Union.

This proceeding derives originally from a September 18, 1974 complaint to the District of Columbia Bar by Mr. Norman Milihram, President, R.M.B. Federal Credit Union (hereinafter referred to as Credit Union), which ultimately led to a formal hearing by Hearing Committee No. Four where oral testimony was taken and argument heard and the Committee requested and subsequently reviewed the briefs of the parties. The Committee made the following *"Findings"*:

*Recommendations of Hearing Committee*

The Hearing Committee recommends that the Disciplinary Board determine that Respondent has violated the relevant disciplinary rules of the Code of Professional Responsibility in two particulars:

"1. Withdrawal of $750.00 from the escrow account without specific authority from the Credit Union, indeed contrary to its express terms, was illegal, dishonest, and, in the circumstances, deceitful.

2. Negotiations of an additional $750.00 retainer fee after the attorney-client relationship had been established between Mr. Golden and himself was dishonest and deceitful and was based on misrepresentations by respondent to his client, Mr. Golden, that

(a) Mr. Golden was in any actual jeopardy of a deficiency claim by the mortgagee, and

clients currently being represented by him for whom substitute counsel would have to be engaged.

(b) $750.00 worth of legal services would be required to free Mr. Golden from a deficiency claim by the mortgagee."

After noting that the Court of Appeals of Maryland "recently approved the disbarment of an attorney for misconduct similar to respondent's" (*Bar Association v. Marshall,* 269 Md. 510, 307 A.2d 677 (1973), the Committee was of the opinion " . . . that the disciplinary rules are not as clear as they might be with respect to a lawyer's responsibilities where funds of third parties are concerned, and that it is difficult in retrospect to assess the reasonableness of fee arrangements . . ." (Pg. 12 Hearing Committee's Report). The Committee concluded that " . . . in light of all the circumstances in the record, including evidence that respondent has a disabling heart condition, we believe that disbarment would be too severe a sanction. We think, however, that a substantial sanction should be imposed, and recommend six (6) months suspension from practice." The Committee also recommended that the Respondent should be required to pay $750.00 to the Credit Union plus interest from the date of withdrawal of that sum from the escrow account, and that if said sum was promptly paid after the decision becomes final the suspension be reduced to three (3) months.

*Proceedings Before the Disciplinary Board*

By letter dated October 3, 1975, the Hearing Committee's findings and recommendations were transmitted to the Respondent. On October 21, the Respondent wrote to Bar Counsel and the Chairman of the Disciplinary Board and stated that he was suffering from a disabling heart condition which he felt would be aggravated if he were to pursue this matter any further by way of appeal or otherwise and stated that he was " . . . willing to comply with the Sanctions imposed by the Committee and shall make payment accordingly." The Respondent filed no brief but appeared in person, *pro se,* at the hearing before the Disciplinary Board on April 12, 1976. The

Respondent made an oral challenge to the findings of the Hearing Committee but was primarily concerned with trying to meet the challenge of Bar Counsel, who filed a brief in opposition to the recommended sanctions of the Hearing Committee and urged disbarment.

*Findings of Fact by the Board*

A review of the record in this case, including the Briefs filed by the respective parties before the Hearing Committee, reveals no real dispute over the facts. The respondent has filed no brief with the Board and his brief before the Hearing Committee consisted of arguments to the effect that his conduct was not one of misrepresentation, deceit, dishonesty or amounting to fraud.

On or about May 12, 1974, Mr. Harry L. Golden, Sr. learned from a legal advertisement in a newspaper that his home was to be the subject of a foreclosure sale the following day by reason of his having defaulted in payments on a home improvement loan owed to Mr. E. M. Levy and secured by a second mortgage. Mr. Golden made inquiry on his job for the name of a good lawyer and some person referred him to the Respondent. Mr. Golden visited the Respondent's office on the afternoon of May 13, 1974 where the Respondent phoned the auctioneer and learned that the foreclosure sale had already taken place earlier that day. On the same day, Mr. Golden entered into an attorney-client relationship with the Respondent and paid the latter a $500.00 retainer to represent him in attempting to negotiate a settlement of the balance due under the second mortgage. The Respondent told Mr. Golden that he might be able to settle the claim of Mr. Levy for approximately $2,500.00, an amount Mr. Golden had indicated he might be able to raise by obtaining a loan from the T.M.B. Federal Credit Union. On May 17, 1974, the Credit Committee of the credit union called a special meeting to consider Mr. Golden's loan application because of their understanding that there was to be a foreclosure on the Golden property in the

near future and that eviction was imminent. Being uncertain of the status of the Golden property at that time, a telephone call was made by Mr. James T. Horner, Chairman of the Credit Committee, to Mr. Golden's attorney, the Respondent herein. Although the Respondent insists that he told Mr. Horner everything he knew about the situation, Mr. Horner testified that he was not made aware of the fact that foreclosure had already occurred and the Credit Committee acted on the assumption that no foreclosure had yet taken place. Mr. Horner phoned the Respondent again later that day to inform him that the Credit Committee was willing to make a loan to Mr. Golden in the sum of $2,500.00 on condition that the money would be used to make a settlement of the debt owed by Mr. Golden to Mr. Levy, and that the commitment would be in the form of a "loan guarantee," rather than sending of any money at that time. Mr. Horner testified that the committee had already drafted a letter indicating that they " . . . were guaranteeing the loan but not sending money . . . " and that he read a draft of the letter over the phone to Mr. Vogel. The Respondent denies that any draft of a letter was read to him. In any event, it is undisputed that it was the Respondent who insisted that a check for $2,500.00 be sent immediately made payable to Mr. Golden and the Respondent. During the telephone conversation, the Respondent dictated a letter to a secretary at the credit union; it was supposedly drafted to protect the interest of the credit union and serve as the covering letter for the $2,500.00 check which was being sent in accordance with the Respondent's instructions. The letter was addressed to the Respondent, dated May 17, 1974, and was signed by Mr. Horner as Chairman of the Credit Committee, and reads as follows:

"With regard to your client Mr. Golden, we have approved his application for a loan in the sum of $2,500.00 with regard to the foreclosure of his home.

It is agreed that Mr. Golden will endorse this check payable to your order but to be held in escrow pending your negoti-

ation to effectuate some compromise to prevent the eviction of Mr. Golden and his family.

It is of course understood that you are to use your best judgment in the accomplishment of the foregoing objectives. In the event that your client must vacate the premises at this time you are to return the $2,500.00 to the T.M.B. Federal Credit Union."

Subsequently, the Respondent entered into discussions with Mr. Levy which resulted in an offer on the part of Mr. Levy to permit Mr. Golden and his wife to remain on the premises and to repurchase the property. The offer was not acceptable to the Goldens and Mr. Golden so informed the Respondent on or about June 11, 1974, at which time he informed the Respondent of his intentions to vacate the premises. Although Mr. Levy had made no demands nor threatened any deficiency judgment against the Goldens, the Respondent told Mr. Golden that " . . . even though the house was foreclosed, he had the right on his promissory note to bring an action against you to collect whatever balance there is that you owed him . . . you would have that over your head and if any judgment—if he tried to file a judgment and attach your salary or any home you were to buy in the future, he'd be able to collect on that promissory note." (TR. 60) The Respondent then persuaded Mr. Golden to enter into a supplemental retainer agreement to pay the Respondent an additional legal fee of $750.00 for obtaining a return of the promissory note, marked "satisfied", which was secured by the second mortgage. This supplemental agreement, dated June 11, 1974, also authorized the Respondent to pay himself the additional fee by withdrawing the sum of $750.00 from the proceeds of the $2,500.00 loan from T.M.B. Federal Credit Union which the Respondent was holding in escrow.

The next day, June 12, 1974, the mortgagee agreed in a telephone conversation with Respondent to release Mr. Golden from any possible liability on account of any deficiency claim which might arise from the indebt-

edness to the mortgagee, provided only that Mr. Golden vacate the premises, in clean and un-vandalized condition, by June 21, 1974. The Goldens vacated the premises on June 14, 1974 and Mr. Levy marked the note "satisfied" on June 24, 1974 and sent it to the Respondent.

On or about June 28, 1974, the Respondent informed Mr. Horner of the Credit Union of his intention to keep $750.00 of the loan proceeds for his fee and to return $1,750.00 to the credit union, and this procedure was objected to by Mr. Horner. On July 1, 1974, Respondent wrote Mr. Horner, informing him that he had deducted the $750.00 for his fee, and returned the $1,750.00. After repeated efforts to try and get Mr. Vogel to pay the $750.00 to the credit union failed, a complaint was filed against the Respondent with the Disciplinary Board.

The Disciplinary Board finds as a fact that the Respondent entered into an attorney-client relationship with Mr. Golden and that he thereafter entered into an escrow agreement with the credit union which authorized the Respondent to use as much of the $2500.00 loan proceeds as was necessary, for the sole purpose of effectuating a settlement of the mortgage foreclosure against Mr. Golden's property, under conditions which would permit Mr. Golden to retain his property to his satisfaction, and for no other purpose. The Respondent acted in violation of the trust agreement and his conduct involved dishonesty, deceit and misrepresentation.

The Board also finds as a fact that the Respondent attorney, during the attorney-client relationship, modified his previous fee arrangement with Mr. Golden to the Respondent's advantage by engaging in conduct which involved a misrepresentation to his client and was deceitful.

### Findings on the Charges

It is clear to this Board that the Respondent fully understood that he had entered into a trust agreement with the credit union to use the proceeds of the loan for the limited purpose of working out a settlement with the mortgage holder on terms which would permit the Goldens to retain their property to their satisfaction and in the absence of any such agreement to return the money in full to the credit union. When the proposal offered for the retention of the property by the Goldens proved unsatisfactory to them and the Goldens decided to vacate, the Respondent was obligated at that point to return the proceeds of the loan in full to the credit union. The Respondent knew full well, or should have known, that he had no authority or right to deduct his fee from the proceeds of the loan and his conduct under the circumstances was such as to be deceitful and dishonest and in violation of DR 1–102(A)(4).

It is equally clear to the Board that at the time that the Respondent persuaded Mr. Golden to enter into a supplemental agreement to pay him an additional fee of $750.00 and to withdraw said amount from the proceeds of the loan from the credit union, the Respondent had no reason to believe that the Goldens would be threatened with any deficiency judgment collection attempts, nor was there any need for any additional legal services on the part of the Respondent which would have justified any additional fee. Assuming that an additional fee was justified, the Respondent knew that it was improper to deduct his fee from the proceeds of the loan and his conduct under all of the circumstances was such as to involve a misrepresentation to his client, and was so deceitful and dishonest to also be in violation of DR 1–102(A)(4).

The evidence clearly supports the findings of the Hearing Committee and we must conclude that the Respondent has violated the Disciplinary Rules as charged.

### Sanctions

Although the Hearing Committee had no difficulty with their Findings of Fact, they seemed to imply that a lawyer's responsibilities where funds of third parties are concerned should be treated differently from a lawyer's responsibilities in dealing with his clients' funds. The Disciplinary Board sees no need for the disciplinary rules to be

stated any more clearly than they presently are, irrespective of whose funds the lawyer may be handling. A lawyer's word should be his bond, and while there may be situations where a lawyer is unsure as to what he can or cannot do under an escrow agreement, the factual situation in the instant case leaves no doubt that the Respondent should have known that his conduct was wrong.

In various kinds of proceedings involving license revocation or removal from office, courts have recognized that the words in a statute or rule describing prohibited conduct must be general, that the duty of the professional is high, and that the professional is to be charged with understanding the level and content of that duty. *Keiser v. Bell*, 332 F.Supp. 608 (E.D.Pa.1971) (removal of judge from office); *Sarisohn v. Appellate Division*, 265 F.Supp. 455 (E.D.N.Y.1967) (removal of judge from office "for cause," where the particular "cause" was enumerated and specified in the charges against him); *Ladrey v. Commission on Licensure*, 104 U.S.App.D.C. 239, 261 F.2d 68 (1958) (revoking a physician's license to practice medicine because of "misconduct," where the physician knew or should have known that performing an illegal abortion constituted "misconduct"); *Gold v. Lomenzo*, 304 F.Supp. 3 (S.D.N.Y.1969), *rev'd. on other grounds*, 425 F.2d 959 (2d Cir. 1970) (revocation of real estate broker's license upon demonstration of untrustworthiness or incompetency to act as a real estate broker). In *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the Supreme Court held that military officers can be dishonorably discharged for "conduct unbecoming an officer" or other conduct to the detriment of the service. In all these cases, the courts emphasized that professionals will be held to understand and to uphold the ethical standards of their profession.

Attorneys in particular are chargeable with knowledge of the meaning of terms of art in their profession. The Court of Appeals for the Seventh Circuit has held that an attorney may be convicted under the federal conflict of interest statute despite the alleged vagueness of the term "conflict of interest." The standards "are matters of common understanding and practice among attorneys. This statute proscribes perhaps as precisely as possible an unethical practice that can manifest itself in infinite forms." *United States v. Nasser*, 476 F.2d 1111, 1115 (7th Cir. 1973).

The same can be said about the meaning of conduct involving "dishonesty, fraud, deceit, or misrepresentation." Code of Professional Responsibility, DR 1–102(A)(4). Respondent need look no further than *Black's Law Dictionary* (4th ed. 1951) to learn (if he did not know) that "Fraud . . properly includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another."[1] Respondent, or any lawyer, must understand that his taking a $750 attorney's fee out of escrowed funds in the absence of the clearest written authorization from the depositor amounts to fraud. "Fraudulent conversion" is defined in *Black's* as "(r)eceiving into possession money or property of another and . . . applying the same to or for one's own use and benefit, or to use and benefit of any person other than the one to whom the money or property belongs." (*Ibid.*) As the Supreme Court of Maryland said in *Balliet v. Baltimore County Bar Association*, 259 Md. 474, 270 A.2d 465 (1970), "An attorney can be guilty of few crimes as reprehensible as appropriating his client's funds to his own use." *Id.* at 468. Here the client never directly owned the funds. He was, however, a beneficial owner. The funds were placed in escrow to be used only for the specified purpose of preventing foreclosure of his equity and eviction of his person, family and property from the premise he was occupying as a home. *Cf., Campen v. Talbot Bank*, 271 Md. 610, 319 A.2d 125, 129 (Md.1974).

1. Citing 1 Story, *Eq.Jur.* Sec. 187; *Howard v. West Jersey & S.S.R. Co.*, 102 N.J.Eq. 517, 141 A. 755, 757.

Even if Mr. Golden possessed the authority to dispose of the funds, it would have been wrong in this case for Respondent to have negotiated an additional retainer agreement for a fee to be taken out of the loan funds.

> An attorney may not take advantage of his relations with his client to enter into a contract concerning property . . in regard to which he has advised his client . . ..

> It is presumed that undue influence or fraud attaches to any assignment or conveyance that an attorney takes from his client while the relation of attorney and client exists.

7 Am.Jur.2d Attorneys Sec. 95. Respondent's superior understanding and command of the situation intensifies the normal presumption of undue influence in negotiating an additional fee agreement. *See, In re Williams*, 180 Md. 689, 23 A.2d 7, 11–12 (Md.Ct.App.1941).

Bar Counsel, in urging disbarment of the Respondent, refers to the fairly recent case of *Bar Association of Baltimore City v. Marshall*, 269 Md. 510, 307 A.2d 677 (Ct. App.Md.1973). There, Attorney Marshall was found guilty of violating DR 1–102(A)(4) for having taken a fee out of a Workmen's Compensation Award which the attorney was holding for his client's benefit. The Court found that the attorney had commingled the client's funds with the attorney's personal funds and that he refused to pay the money over to his client upon demand. A recommendation for a one year suspension was rejected by the Maryland Court which concluded that the facts justified disbarment.

In the instant case, we note that Mr. Golden has never made any demand for a refund of the extra fee from the Respondent. We also note that there was no commingling of the proceeds of the loan with the Respondent-attorney's personal funds. Additionally, the Respondent made no attempt to conceal from his client or from the credit union the fact that he was deducting his $750.00 fee from the proceeds of the loan. Had he falsely represented to his client or to the credit union that the $750.00 went for something other than his fee then the Board would be hard put to recommend anything less than disbarment.

The Hearing Committee, in recommending sanctions, took into consideration evidence that the Respondent has a disabling heart condition. While the Board recognizes the fact that there may be situations when the physical condition of the Respondent should be taken into consideration in determining sanctions, we are of the opinion that no such factor need be taken into consideration in the instant case. We have given some consideration to the Respondent's oral statement to the Disciplinary Board on April 12, 1976 to the effect that he plans to retire immediately and will be moving to Florida in from two (2) to three (3) weeks, a jurisdiction which does not practice reciprocity with the District of Columbia regarding admissions to the bar. Bar Counsel has requested that we consider the fact that the Respondent has been previously disciplined by a private reprimand in considering sanctions. Having considered all of the evidence, we conclude that the facts in this case do not warrant disbarment.

*Conclusion*

The Hearing Committee recommended a six (6) months suspension of the Respondent from practice with a condition that this be reduced to three (3) months if the Respondent repaid the credit union and/or Mr. Golden the sum of $750.00 (the amount of the additional attorneys fee), plus interest. This Board, in two recent recommendations, has taken the position that once the sanction has been determined in a particular case, there should be no diminution of that sanction by reason of some subsequent restitution. We do think it proper to require restitution as a condition precedent to any petition for reinstatement of a suspended or disbarred attorney. This Respondent represented to the Board that he paid the $750.00 plus interest to the credit union within one week of the date of the Hearing Committee's findings.

We note that the Respondent has been previously disciplined and we consider this relevant in determining what sanctions to recommend. Information regarding prior discipline is not made available to Inquiry or Hearing Committees as a matter of established policy of the Disciplinary Board, so as not to unduly influence the triers of fact.

The Disciplinary Board, for the reasons stated herein, hereby recommends that this Court suspend the Respondent from the practice of law for a period of nine (9) months.

Respectfully submitted,

/s/ Daniel M. Gribbon
DANIEL M. GRIBBON, Chairman

/s/ Wiley A. Branton
WILEY A. BRANTON, Vice-Chairman

/s/ David Epstein
DAVID EPSTEIN

/s/ John M. Ferren
JOHN M. FERREN

/s/ David T. Austern
DAVID T. AUSTERN

/s/ Goler T. Butcher
GOLER T. BUTCHER