**In re Thomas J. SCHNEIDER,
Respondent.**

No. 86–21.

District of Columbia Court of Appeals.

Argued Sept. 30, 1987.

Decided Jan. 24, 1989.

W. Gary Kohlman, with whom Warren Anthony Fitch, Washington, D.C., was on the brief, for respondent.

---

Samuel McClendon, Asst. Bar Counsel, with whom Thomas H. Henderson, Bar Counsel, Washington, D.C., at the time the brief was filed, was on the brief, for petitioner, for Office of Bar Counsel.

Before ROGERS, Chief Judge,* and NEWMAN and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

In this disciplinary case, we are called upon to deal with the question of the imposition of sanction upon a member of the bar who, without intent of personal gain, engages in action involving alteration of documents; *viz.*, eight credit card receipts submitted for travel expense reimbursement.

### I. The Facts.

While a first-year associate with the law firm he had joined upon graduation from law school,[1] respondent Schneider submitted false travel expense reports to this firm on eight separate occasions over a seven-month period in 1981. Specifically, Schneider altered eight credit card receipts by inserting a "1" before each actual charge, thus overstating the amounts represented by such slips by a total of $800. Each receipt purported to be the cost of "hotel expenses."[2] All of the charges related to the representation of the firm's client, the Kellogg Company, and Schneider was reimbursed by Kellogg through the law firm's accounting department for the expenses he had claimed.

The hearing committee found that Schneider was attempting only to recoup money that he believed he personally had advanced for other legitimate client-related travel expenses. He believed each of these eight alterations represented an accurate estimate of his out-of-pocket expenditures for the client and were no more than the amount of the money he believed he had advanced for the client. The hearing committee further found that in each of these eight instances, Schneider did not intend to personally gain by his act, nor did he intend to deceive or materially misrepresent to either the law firm or the client "the true and accurate total amount of his client-related expenditures."

However, the committee found, Schneider did in fact deceive both the firm and the client because he materially misrepresented the amount of the particular expense for which the altered receipt was submitted. It concluded that there was no doubt that Schneider engaged in dishonest, fraudulent and deceitful conduct by submitting the altered receipts for reimbursement, in violation of DR 1–102(A)(4), which reads:

"(A) A lawyer shall not:

.     .     .     .     .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."[3]

With respect to the sanction, the committee found some analogy to cases involving misappropriation. However, it noted, those

---

\* Judge Rogers was an Associate Judge of the court at the time this case was argued. She became Chief Judge on November 1, 1988.

1. Schneider graduated from college in 1973 and obtained a Ph.D. from Oxford University in sociology before entering law school. He left the law firm in January 1983.

2. For each trip, Schneider submitted a "cash expense report" showing the breakdown of expenses in a half-dozen or more categories, one of which was "hotel expenses." (Other categories on one or more of the forms in which Schneider also listed expenses were meals; taxi, limousine, etc.; parking, tolls, gasoline; magazines & newspapers; xerox; tips.) The credit card receipts themselves indicated they were for "lodging" or the like, although some of the receipts in the record before the court are virtually illegible. In the specifications, Bar Counsel

charged that Schneider claimed each expense for a "hotel room." Schneider admitted each such charge, while denying that he acted fraudulently.

3. The specifications filed by Bar Counsel charged that Schneider's conduct was in violation of DR 1–102(A)(4) because it was "dishonest, fraudulent, and deceitful." It did not mention misrepresentation. The specifications also charged a violation of DR 1–102(A)(3) (illegal conduct involving moral turpitude), but the hearing committee found no violation of this provision since Bar Counsel had failed to prove by clear and convincing evidence that Schneider had acted for personal gain. *See* Board on Professional Responsibility Rule 11.4 (requiring proof by "clear and convincing evidence").

cases generally involved more egregious conduct, prior discipline, and additional rule violations. Taking into account that respondent had not been the subject of previous discipline and had no record of dishonest conduct, and concluding that the conduct was a temporary aberration resulting, in part, from the demands of Schneider's practice, the committee recommended a sixty-day suspension.

The Board on Professional Responsibility agreed with the hearing committee that there was "no doubt" that Schneider had engaged in dishonest, fraudulent and deceitful conduct by submitting the altered receipts for reimbursement. However, it did not accept the recommendation for sanction. Instead, in its first report to this court, dated January 3, 1986, six participating members of the Board recommended a one-year suspension (one in a concurrence recognizing the sanction was "at the severe end of the spectrum") and one member recommended disbarment. Subsequent to the preparation of the Board's report, we decided *In re Reback*, 513 A.2d 226 (D.C. 1986) (en banc), which had also involved a violation of DR 1–102(A)(4), among other provisions, and involved mainly the issue of appropriate sanctions. Accordingly, we remanded the Schneider matter to the Board for further consideration in light of that decision.

The Board has now submitted to us a second report, dated November 25, 1986, dealing with what it rightly describes as "the difficult question of matching appropriate discipline" to Schneider's misconduct. The Board saw as the gravamen of

Schneider's offense that he intended to submit false documents to the firm and ultimately to the client,[4] and that this knowing, conscious decision to physically alter the receipts and to submit the false claims was totally unnecessary and totally dishonest. The Board unanimously recommends to us a six-month suspension.

Schneider makes two arguments before us attacking the recommendation of the Board. First, he asserts that because he had no intent to deceive and because the mis-stated facts were not material, no violation of DR 1–102(A)(4) occurred at all. Second, he asserts that even if such a violation occurred here, his sanction, at most, should be public censure.

## II. Violation of DR 1–102(A)(4) [5]

■ Here, as in many situations, two elements intertwine: first, the physical acts committed by the party and second, the state of mind with which such acts were done. Schneider argues that a violation of DR 1–102(A)(4) can occur only when there is proof of scienter, which, as we understand him to suggest, means that the actor must have an affirmative wrongful intent that the recipient of the conduct misunderstand or be defrauded or deceived. Here, he asserts, both the committee and the Board specifically found that Schneider did not intend to deceive the client or the firm.

There are several difficulties with this argument. To begin with, the finding is not as clear-cut as stated by Schneider. The precise wording of the hearing committee report is that Schneider did not "intend to deceive or materially misrepresent to

---

**4.** This latter assertion appears to be an overstatement of the record. Schneider testified that he knew from discussions with billing partners that Kellogg's only interest was in travel expenses as an undifferentiated whole and nothing in the record indicates that Kellogg asked for or was provided with a detailed breakdown. However, it is true that the potential for client misrepresentation was of course present, with a retroactive change in policy, a tax audit, or the like.

**5.** Under our present Code of Professional Responsibility, three rules deal with the requirements of truth in factual representations in differing situations. DR 1–101(A) deals with false statements and nondisclosure in applying for

admission to the bar. DR 7–102(A)(5) provides that "in his representation of a client," an attorney shall not "knowingly make a false statement of law or fact," a rule provision, incidentally, under which Schneider might have also been charged, although it appears that the provisions of DR 7–102 are directed mainly at dealings with tribunals and third parties. Finally, there is DR 1–102(A)(4). The proposed ABA Model Rules of Professional Conduct provide separately for honesty to tribunals, Rule 3.3, and to third parties, Rule 4.1. Rule 8.1 deals with honesty in bar admissions, and Rule 8.4(c) carries forward the language of DR 1–102(A)(4) unchanged.

either Sayfarth and Shaw or his client the true and accurate total amount of his client-related expenses." It is somewhat ambiguous whether the committee found a complete absence of any intent to deceive or instead found no intent to deceive as to the total amount of expenses (leaving open the question of intent to deceive with respect to the credit card slips themselves).

Even absent a positive intent to deceive, that does not end the inquiry. Here, in the Board's words, Schneider "intended to submit false documents to the firm." He made a "knowing, conscious decision to physically alter the receipts and to submit the dishonest, false claims."[6] Furthermore, his alterations did in fact deceive the firm, and potentially the client, because "he materially misrepresented the amount of a particular expense for which the altered expense was submitted"; that is, the expense evidenced by the altered receipt (and accompanying trip expense report, *see* note 2 *supra*) was not in fact actually incurred as shown on the receipt, but rather was part of other, generalized (and nonreceipted) travel expenses. Thus, Schneider intentionally altered documents so as to represent facts that were false in two significant aspects: a) that expenses had been incurred that were in fact different from those actually incurred, and b) that documentary proof, issued by a third party, existed evidencing such expenses.

■ Schneider's argument comes down to the proposition that an attorney may intentionally falsify documents and those falsified documents may in fact be acted upon, and yet the attorney has committed no disciplinary violation because he did not affirmatively intend to deceive. However his strict scienter argument may apply in other contexts,[7] we are unwilling to adopt it in a case of the deliberate falsification of documents, and particularly not where they touch on the sensitive area of matters involving, albeit indirectly, client funds. Documents are an attorney's stock in trade, and should be tendered and accepted at face value in the course of professional activity. If an attorney knowingly proffers altered documents in a context where the attorney knows or should know that action may be taken thereon, the attorney has engaged in conduct involving deceit[8] in violation of the rule, whatever the ultimate intent or motives may have been in making such alterations. The latter may go to sanction, but not to the threshold issue of violation *vel non*.

It is instructive to examine respondent's own explanation for his conduct, as he testified at the hearing:

I was trying to accurately represent travel expenses, and in my mind ... all I really did was try to put together a shorthand way of accounting for my travel expenses. Changing the receipts was a shortcut way to account for a lot of lacking receipts, sloppy bookkeeping, and when I was thinking about it, I didn't really think about it. It seemed like an easy way to avoid having to ask—

---

**6.** We think these conclusions flow naturally from the hearing committee's findings. We are bound to follow the findings of the Board unless unsupported by substantial evidence. D.C. Bar R. XI, § 7(3).

**7.** We do not think it useful to seek analogy in the thicket of intent and its required manifestations richly developed in the criminal law. *See generally* R. PERKINS & R. BOYCE, CRIMINAL LAW ch. 7 (3d ed. 1982). "It is well established that a lawyer's actions do *not* have to reach the level of criminal conduct before disciplinary action may be taken." *In re Minninberg,* 485 A.2d 149, 151 (D.C.1984) (emphasis in original). For instance, recently we ruled that reliance is not necessary to a disciplinary finding of dishonesty, as opposed to criminality. *In re Kennedy,* 542 A.2d 1225, 1227 (D.C.1988).

**8.** Without attempting to define the full scope of the concept, we also think that a falsification of documents in the circumstances here was conduct involving "dishonesty" within the meaning of the rule. *See In re Kennedy, supra* note 7 (misrepresentation as to actual salary "material and dishonest"); *In re Reback, supra,* 513 A.2d at 231 (deception of client and filing of false pleading "a dishonest course of conduct"). While the charge against respondent did not expressly include the element of misrepresentation, *see* note 3 *supra,* the proceedings obviously focused upon this feature as an element of the deceit, and we cannot see how respondent's defense was affected by its omission. He knew full well the acts for which he was being charged. We see no need to determine whether the conduct here also involved "fraud."

Mr. Kramer, when he made the comments that everybody always gets compensated for receipts, maybe when you're a partner you do, but when you're an associate, people ask you questions and everything else, where are the receipts, how can you document it and so forth, these were at the end of some long days, and I really just didn't want administrative hassles, and this seemed like the easiest and neatest way to simply account accurately for incurred expenses in travel.... What I was simply doing was saying, look, this is a legitimate travel expense, and I was simply trying to provide the backup documentation, and I was doing it through the changed receipts.

It is difficult to reconcile respondent's own testimony with any assertion that he could not have expected anyone to act on the misrepresentations at any time. Indeed, by providing false backup documentation, he did achieve hassle-free reimbursement. The preference for documentation in the expense account field is hardly a secret. Respondent's own testimony shows he was aware of this preference.

We do not deal here with a situation where the attorney is unaware that he has even committed the act which is the basis of the disciplinary action. Even if no intentional deceit, misrepresentation, or fraud was involved in this case, Schneider plainly knew that the receipts were altered and that they thereby falsely showed what they actually were for. He intended to submit false documents to his firm in seeking reimbursement for expenses. They constituted a deception on which, foreseeably, both the firm and at least potentially the client might act, and the rule was thereby violated.

Our case law involving charged violations of DR 1–102(A)(4) is not to the contrary. In *In re Hutchinson,* 534 A.2d 919 (D.C.1987) (en banc), our most recent en banc pronouncement on the subject, we were dealing with the issue whether the violation of an SEC regulation definitionally involved fraud. Since the attorney had no knowledge that the information he was communicating was inside information and a negligent communication was itself sufficient to violate the regulation, we concluded that the attorney's violation of the SEC regulation could not form the basis for a violation of DR 1–102(A)(4) for conduct involving fraud in the absence of affirmative proof of a fraudulent intent or state of mind.[9] But here, the violation is not bottomed solely on fraud, nor is there any claim that Schneider's deception was the result of negligence. Likewise, in *Reback, supra,* our focus was on the fact that the attorneys deliberately and knowingly made false representations to the court and to their client. We did not need to concern ourselves with the ultimate intent or motives behind such acts since it was plain that they were done with knowledge of their falsity. Neither *Hutchinson* nor *Reback* can support Schneider here.[10]

Nor do we find merit in Schneider's argument that the deceptive facts here were not "material," a supposed requirement for a DR 1–102(A)(4) violation. Assuming such a requirement, we cannot characterize the deception here as anything approaching immateriality. Schneider asserts that the falsified slips "accurately reflected the amount he was owed by the law firm." However, there is no finding by the Hearing Committee to this effect, only that Schneider so believed. More importantly, the deceptive facts go to the nature of

**9.** We did sustain the finding of violation of DR 1–102(A)(4) for conduct involving dishonesty or misrepresentation based on the attorney's knowing untruthful statements to the SEC.

**10.** *See also In re James,* 452 A.2d 163 (D.C.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983), where we talked about "scienter" as an element of a DR 1–102(A)(4) violation. Later on in the opinion we indicated our meaning in the use of this term by our citation of DR 4–101(B) ("[A] lawyer shall not

knowingly ...") as an example of a rule containing "explicit scienter standards." *Id.* at 167. In *In re Rosen,* 481 A.2d 451, 453–54 (D.C.1984), we found sufficient to support a violation of DR 1–102(A)(4) that Rosen had made "knowing misrepresentations" and that the false statements were "knowingly" made. *See also In re Thompson,* 538 A.2d 247 (D.C.1987) (knowingly assisting in presentation of false statements to INS constitutes a DR 1–102(A)(4) violation).

expenses in the amount of $800 and the existence of bona fide documentation therefor. The fact that a documentary alteration is knowingly made with respect to a matter ultimately involving client funds, a particularly sensitive area of professional conduct warranting scrupulous care, renders it presumptively material in and of itself. While a situation might exist where a representation on such a matter could be labeled de minimis, we do not see how such a finding could be made here. *Cf. In re Hessler,* 549 A.2d 700 (D.C.1988) (inadvertent misappropriation of client's funds in the amount of $912, although paid in full on request); *In re Reback, supra* (violation found in filing false pleading even though no substantive harm presumably would have ensued even if falsity never discovered).

### III. Sanction

■ Schneider strongly contests the six-month sanction recommended by the Board. Relying on comparisons with *In re Reback, supra,* and *In re Hutchinson,* 518 A.2d 995 (D.C.1986) (panel),[11] he asserts that the sanction, at most, should be public censure.

We start with the recognition that our D.C. Bar Rule XI, § 7(3) requires this court to "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." Otherwise put, we engage in only a "general review for abuse," enforcing "a general sense of equality in the sanctions handed out," but otherwise respecting "the Board's sense of equity in these matters unless that exercise of judgment proves to be unreasonable." *In re Haupt,* 422 A.2d 768, 771 (D.C.1980). Nevertheless, as we noted in *Reback, supra,* 513 A.2d at 230, this court has had little occasion to pass upon conduct such as was involved in that case and here, and therefore our role in reviewing the Board's recommendation may be more assertive than in more familiar types of misconduct.

With respect to Schneider's ultimate intent or motive in submitting the altered slips, the hearing committee's findings and the Board's "background summary" simply assert that Schneider did, in fact, deceive through his alterations, thus arguably describing the effect rather than the intent or motive. In its sanctions discussion, the Board states that Schneider intended to submit false documents and knowingly altered the receipts and submitted false claims. There is no assertion that Schneider thereby received any more than was due him; indeed, it is found that he did not act for any personal gain.

We therefore proceed on the basis that his motivation was, as he asserts, simply to utilize a "short-cut" method to obtain reimbursement to which he thought he was entitled. This fact in itself forms a significant contrast with the conduct in both *Reback* and *Hutchinson,* where the attorneys hoped to cover up one misdeed by committing another. *See Hutchinson, supra,* 534 A.2d at 925–26. Here, Schneider had no malign ultimate aim; he thought he was entitled to the money. Nor is there any finding that the client or the law firm thought Schneider was seeking reimbursement for expenses to which he was not entitled. It was stipulated before the hearing committee that the client was "at all times totally satisfied" with Schneider's work. His misconduct rather arose from his failure to maintain receipts for all of his expenditures and what one member of the Board described as his "extraordinarily naive solution."

The more serious nature of the misconduct in *Reback* is also demonstrated by the fact that the attorneys' conduct there violated not only DR 1–102(A)(4), but also involved conduct prejudicial to the administration of justice, DR 1–102(A)(5), neglect of a legal matter, DR 6–101(A)(3), and knowingly making a false statement of law or fact in representation of a client, DR 7–102(A)(5). While it is true that Schneider on eight separate occasions committed acts of deception and thus had "sufficient time

---

**11.** Schneider's brief and oral argument predated our en banc decision in *In re Hutchinson,* 534    A.2d 919 (D.C.1987), raising the penalty to a one-year suspension.

between the incidents to allow him to reflect on the gravity of his actions," *Hutchinson, supra,* 534 A.2d at 926 (quoting from the Board's report), nevertheless the wrongful conduct was identical on each occasion and not a distinctly different violation.

In recommending its sanction, the Board invokes a number of cases involving improper dealing with clients' funds.[12] We share the Board's concern over the need for meticulous diligence in this area. However, it seems to us that the conduct in those cases was more egregious than Schneider's. All involve instances where the attorney made personal use of client or trust funds. Likewise, in the cases cited from California and New Jersey involving falsification of expense reports,[13] the claimed expenses were never in fact incurred in any form.

Schneider, on the other hand, in seeking a lesser sanction, presents as analogous the same four cases relied upon by Hutchinson. *See In re Hutchinson, supra,* 534 A.2d at 926. For much the reasons set forth in that opinion, we must reject those cases as controlling here in the abstract, adding, with respect to *In re Rosen,* 481 A.2d 451 (D.C.1984), that we think improper action touching client funds on eight occasions would normally warrant more severe sanction than the particular misstatements made by Rosen in his two motions for continuance and in the opposition to a motion to set aside the award of attorneys' fees. A similar distinction might be made with respect to *In re Hadzi–Antich,* 497 A.2d 1062 (D.C.1985) (misrepresentation on resume to prospective employer).

When all is said and done, however, "comparisons between cases are inexact at best, and 'every case must turn on its own particular facts.'" *In re Hutchinson, supra,* 534 A.2d at 926 (quoting in part from *In re Hines,* 482 A.2d 378, 386 (D.C.1984)). There are a number of significant mitigating factors in the case before us, some already alluded to. We note, as did the Board, Schneider's remorse, and his education from this harrowing experience. He has fully cooperated with Bar Counsel every step of the way. At the time of the offense, in 1981, he was barely an initiate into the bar, and his indoctrination into the firm's financial procedures had been short-cut by circumstances. Since the events in 1981, he has had, we understand, an unsullied record at the bar. Furthermore, this disciplinary process has dragged on into its sixth year, a delay to which we ourselves have contributed. *See In re Williams,* 513 A.2d 793, 798 (D.C.1986). Finally, we are this day imposing a sanction of thirty days in another disciplinary case which bears considerable resemblance to the one before us, such as in the absence of motive of personal gain, the otherwise unblemished record over a considerable period of professional life subsequent to the event, and the extended delay in the disciplinary process. *In re Miller,* 553 A.2d 201 (D.C.1989).[14] Under all the circumstances, we conclude that the considerations that shape Bar disciplinary determinations will be served by a suspension of thirty days.

*So ordered.*

NEWMAN, Associate Judge, dissenting:

The majority's selective silences regarding certain aspects of this case speak louder and reveal more than do the words put to paper in its opinion. In the interest of presenting a complete and fair exposition of the relevant facts, I add the following to fully inform the readers of these opinions.

---

**12.** *In re Hines,* 482 A.2d 378 (D.C.1984); *In re Harrison,* 461 A.2d 1034 (D.C.1983); *In re James,* 452 A.2d 163 (D.C.1982), *cert. denied,* 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983); *In re Vogel,* 382 A.2d 275 (D.C.1978).

**13.** *Stratmore v. State Bar,* 14 Cal.3d 887, 538 P.2d 229, 123 Cal.Rptr. 101 (1975); *In re Franklin,* 71 N.J. 425, 365 A.2d 1361 (1976).

**14.** We note also that in *Miller,* the Board's original recommendation was a two-year suspension, reduced on remand to a one-year suspension, while here the hearing committee recommended a 60–day suspension, increased by the Board in its original recommendation to one year and subsequently, on remand, reduced to six months. We do not think a greater sanction by this court on Schneider than on Miller would be warranted.

Schneider graduated from law school in June 1980, and was admitted to the District of Columbia Bar on December 19, 1980. He joined the Washington office of Seyfarth, Shaw, Fairweather & Geraldson as an associate. In January 1983, he resigned voluntarily from Seyfarth, Shaw to form another firm. During the following months, protracted and bitter negotiations ensued between Seyfarth, Shaw and Schneider concerning clients who had left Seyfarth, Shaw and followed Schneider to his new firm. On August 31, 1983—almost eight months after Schneider left Seyfarth, Shaw, and more than a year after the firm became aware of the events that bring us here—the managing partner of Seyfarth, Shaw filed a complaint with Bar Counsel.

When Schneider joined Seyfarth, Shaw, he was assigned many clients. One of his clients was the Kellogg Company. The relationship between Kellogg and Schneider had begun years earlier. Schneider had worked as a consultant for Kellogg in the area of labor-management relations prior to attending law school. In addition, Schneider's father had worked for Kellogg for many years and had been instrumental in getting his son hired as a consultant.

As a consequence of his prompt immersion into full-fledged representation of clients, Schneider did not receive the normal instruction given associates concerning proper accounting procedures. The firm preferred receipts for expenditures in excess of $25.00 incurred by an attorney on behalf of a client. Where receipts were not presented, however, reimbursement was still possible. Indeed, no member of the firm who testified could recall when reimbursement had been denied because of the lack of a receipt. Other lawyers at the firm "lumped" expenses in claims for reimbursement, a practice of which Schneider was aware.

During a seven-month period beginning the month Schneider was admitted to prac-

tice, Schneider altered credit card receipts to reflect a higher amount for the express purpose of obtaining reimbursement for funds he had expended properly on behalf of a client. The total sum expended was $800. Schneider asserts that he had no intent to defraud, deceive or materially misrepresent the facts to the law firm or the client when he requested reimbursement for these funds.[1]

Schneider's tenure with Seyfarth, Shaw appeared to be profitable for both him and the firm. As an associate, Schneider's billings exceeded a quarter of a million dollars per year. In 1982, after the partners had met with Schneider to suggest that he adopt a better financial record-keeping system, and almost one year after Schneider altered the last receipt, the firm awarded Schneider the largest bonus and salary increase among all of the associates at Seyfarth, Shaw. In addition, no client had expressed dissatisfaction with Schneider's performance, including those clients who followed Schneider to his new firm and those who were thereafter informed by Seyfarth, Shaw of its complaint to Bar Counsel in this matter.

The Board on Professional Responsibility found that Schneider violated DR 1-102(A)(4) by "submitting altered receipts for reimbursement," conduct it found to be "dishonest, fraudulent and deceitful." Report and Recommendation of the Board on Professional Responsibility (Jan. 3, 1986) at 6. The Board acknowledged the Hearing Committee's finding of fact that Schneider acted not for personal gain but rather to recover legitimate out-of-pocket expenses. *Id.* The Board concluded, however, that "Schneider not only submitted false expense reports and altered receipts to the Accounting Department, but, in effect, committed fraud..... [T]here is no doubt that the alteration of the credit card slips could subject [him] to criminal prosecution."[2] *Id.* at 6–7. The Board opined fur-

---

1. The Board's statement that Schneider intended these receipts to be forwarded ultimately to the client is wrong. *Supra,* at 208 & note 4. In addition, Seyfarth, Shaw billed clients for reimbursements in lump-sum undifferentiated billings without documentation.

2. The Board, in neither its original report nor its report after remand, suggests what criminal statute Schneider violated. At oral argument, I probed Bar Counsel to suggest the criminal statute potentially violated. He suggested none. Neither can I.

ther that Schneider had "lied to his client [and] deceived his law firm." *Id.* at 7. On remand, the Board characterized the violation as follows: "[Schneider] did, in fact, deceive Seyfarth, Shaw and the client because he *materially misrepresented* the amount of particular expenses for which the altered expense account was submitted on eight different occasions." Report and Recommendation of the Board on Professional Responsibility (Nov. 25, 1986) at 3 (emphasis added).

Before this court, Schneider challenges the Board's finding that he violated DR 1–102(A)(4). He contends that a finding of deceitful intent is required to violate the disciplinary rule or, as the majority phrases Schneider's argument, "that a violation of DR 1–102(A)(4) can occur only when there is proof of scienter." *Supra*, at 208. Additionally, Schneider argues that a violation of DR 1–102(A)(4) involving dishonesty, fraud, deceit or misrepresentation occurs only when the false representation is of a *material* fact.

The majority's response to these two arguments is deficient. The majority disposes of the intent issue by concluding that Schneider's alteration of the documents constituted deceit and dishonesty "whatever the ultimate intent or motives may have been in making such alterations." *Supra*, at 209 & note 8. I do not think, however, that "the ultimate intent or motives" of an actor can be analytically truncated from the alleged deceitful or dishonest act. Schneider's "ultimate intent" was to recoup legitimate out-of-pocket client expenses, a fact upon which everyone including Seyfarth, Shaw, Kellogg, the Hearing Commission, the Board, the majority and I agree. In fulfilling this intent to recoup money that was rightfully his, Schneider altered the credit card receipts. Although his conduct was clearly an inappropriate manner in which to proceed, I do not agree with the majority's conclusion that a violation of DR 1–102 can be predicated on the mere labeling of Schneider's actions as "dishonest" and "deceitful" without a finding of deceitful intent.

The majority also summarily disposes of the claim that the false representation must be of a material fact. The majority states that "even [a]ssuming such a requirement, we cannot characterize the deception here as anything approaching immateriality." *Supra*, at 210. Somewhat confusingly, the majority states further that a documentary alteration is "presumptively material," although situations "might exist where a representation on such a matter could be labeled de minimis." *Id.* at 211. To support these views, the majority emphasizes, and rightfully so, that scrupulous care be taken when dealing with client funds. Yet no claims are made here that the client was billed wrongly or that Schneider even thought that the altered receipts would be channelled to the client.

I cannot join this cavalier dismissal of the substantive issues raised by this case. I have serious doubt that we can find a violation of DR 1–102(A)(4), given the record, which my colleagues constituting the majority characterizes as "somewhat ambiguous." *Supra*, at 209. Unlike the majority, I think it is necessary that we first resolve the scienter issue. I would require deceitful intent to support a claim of dishonesty or deceit under DR 1–102(A)(4). Additionally, I would require a finding that any representation which is the basis of a claimed violation of DR 1–102(A)(4) must be "material." I note in this regard that Rules 3.3, 4.1 and 8.1 of the ABA Model Rules of Professional Conduct which are cited by the majority, all require that the misstatement at issue be of a material fact. *Supra* note 5, at 208. Under any definition of "material fact," I doubt one can find that the representations in this case are material.

Most important to me, however, is that neither the Board on Professional Responsibility nor—even worse—the majority, have deigned to answer the questions raised by this case. For example: (1) is scienter required to support a violation of DR 1–102(A)(4), (2) how is scienter defined, (3) must the false representation be of a material fact, and (4) how is material defined. I cannot join the majority's attempt

to avoid addressing these difficult issues by summarily labeling Schneider's conduct as "dishonest," or as constituting "deceit." In my view, the majority is saying no more than that since we can recognize "dishonesty" when we see it, we can impose sanctions upon one who is "dishonest."

I am troubled particularly by the majority's use of the term "dishonest" to find a violation under these facts. Nowhere in the majority's opinion or in the Board's two reports is the term "dishonesty" defined as used in DR 1–102(A)(4). I can think of few terms that are more vague when used in a regulatory context. Can anyone doubt that a Code of Professional Responsibility which had one canon—"A lawyer shall always act honestly"—would present substantial problems of vagueness? What about a criminal code that merely interdicted "the failure to do right"? In my view, any definition of "dishonesty" as that term is used in DR 1–102(A)(4) must include a requirement of materiality. Would a lawyer who told a client that he had finished work on a client's case at 3 p.m. on May 15th when the lawyer knew in fact that the work was completed twenty-four hours later, be guilty of violating DR 1–102(A)(4) if the false representation was not material to anything? Clearly, I think not.

Presented with this record and given the findings of the Board, I cannot say with assurance that Schneider has violated DR 1–102(A)(4). Of course, that in no way implies that his actions were proper. He recognizes that they were not.

Even if I found a violation, I would disagree with the majority on the appropriate sanction. Indeed, I find the recommended discipline of six months suspension only slightly less unreasonable than the totally unreasonable sanction of one year which was recommended by the Board in its original report. Taking into account all of the interests to be served by the lawyer disciplinary process, I think the appropriate discipline in this case is public censure.

I suggest that we disserve the public and our profession when we fail to resolve fundamental due process issues before we impose sanction. Likewise, we disserve the public when we impose a thirty-day suspension in a case where the circumstances do not warrant it. I hope in the future we will protect the interests of client-victims with the same diligence as the Board has sought to protect the interest of this law firm-"victim." *See, e.g., In re Thajauna D. Miller,* 553 A.2d 201 (D.C.1989) (Board recommends one-year suspension where the only victim was a law firm; the court imposed a one-month suspension).