750 So.2d 942 (1999)
In re A. Gill DYER.
No. 99-B-1652.
Supreme Court of Louisiana.
October 19, 1999.
Charles B. Plattsmier, Esq., Baton Rouge, Bernadine Johnson, Esq., Counsel for Applicant.
*943 A. Gill Dyer, Esq., Covington, Jerry Read, Esq., Biloxi, MS, Counsel for Respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM[*].
This attorney disciplinary proceeding arises from two counts of formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, A. Gill Dyer, an attorney licensed to practice law in the State of Louisiana, but currently under interim suspension.[1]

UNDERLYING FACTS
Respondent, along with attorney F. Evans Schmidt, served as co-counsel for the plaintiff in the matter of Lenuel Bragg v. Daniel Moloney, et al., Civil Action No. 93-3649 on the docket of the United States District Court for the Eastern District of Louisiana. On December 6, 1994, Mr. Bragg terminated respondent's services, and respondent subsequently intervened to recover his attorney's fees and outstanding costs. In connection with the intervention, respondent submitted an itemized costs statement. A dispute arose over these charges. After a hearing, a federal magistrate judge disallowed fifteen charges totaling $3,281.41.[2] In her reasons for judgment, the magistrate found these charges included inflated charges for depositions and medical services, charges for other legal-related services not rendered (such as the service of subpoenas), a videotape that was neither ordered nor paid for, postage not used, and photocopies not made.
Also in connection with the Bragg litigation, respondent received a medical payments check from State Farm Insurance Company dated November 28, 1994 and payable to "Lenuel Bragg and his attorney of record F. Evans Schmidt." This check, in the amount of $982, represented funds respondent had allegedly advanced during the course of the litigation to pay Mr. Bragg's medical expenses. On March 20, 1995, this check was deposited in respondent's personal checking account. Although the check purportedly contained the endorsements of Mr. Bragg and Mr. Schmidt, both men denied ever signing the check.
Subsequently, respondent's conduct in the Bragg litigation became the basis of federal court disciplinary proceedings. On September 23, 1996, respondent was disbarred from practice in the United State District Court for the Eastern District of Louisiana.

*944 DISCIPLINARY PROCEEDINGS
On January 10, 1995, the ODC received a complaint from Mr. Schmidt regarding respondent. After conducting an investigation, the ODC instituted formal charges against respondent, alleging he violated Rules 1.5(c) (contingency fee arrangements), 1.15(a) (safekeeping property of a client or third person), 1.15(b) (obligation to promptly deliver property of a client or third person), 1.15(c) (dispute concerning property held by the lawyer), 3 .3(a)(2) (concealing material facts from a tribunal), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(b) (commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), and 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct, and Supreme Court Rule XIX, § 9(b) (engaging in conduct violating the rules of professional conduct of another jurisdiction).
Respondent filed an answer, essentially denying the charges. Although respondent admitted that certain errors were contained in the costs statement, he contended these charges were the result of good faith errors. As to the check, respondent asserted that Mr. Schmidt "stole" the check from the Bragg file and deposited it into respondent's account in an attempt to "frame" respondent.

Hearing Committee Report
After evaluating the credibility of the witnesses and reviewing all the evidence introduced, the committee found respondent commingled and converted client funds, failed to account for client funds, attempted to collect overcharges and fictitious costs from his client, engaged in conduct involving fraud, deceit, dishonesty and misrepresentation, and concealed material facts from a tribunal. The committee indicated it was not persuaded by respondent's defense that Mr. Schmidt "stole" the $982 "med pay" check, forged the client's name and deposited the check into respondent's personal account in order to frame him. The committee further found that respondent did not disclose the existence of this "med pay" check to the federal court during the proceedings to determine the legitimacy of the expenses respondent charged to his former client. Finally, the committee did not believe respondent's assertion that the numerous overcharges and fictitious charges on the statement of costs were all merely "mistakes." The hearing committee determined the ODC proved by clear and convincing evidence that respondent violated the professional rules as charged. Pursuant to Louisiana State Bar Ass'n v. Hinrichs, 486 So.2d 116, 122-23 (La.1986), and In re: Nichols, 98-2942 (La.12/18/98), 723 So.2d 410, the committee found the baseline sanction is a three-year suspension.
The committee noted the following aggravating factors: dishonest or selfish motive, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law (admitted in 1981). As mitigating factors, the committee found the absence of a prior disciplinary record, and the imposition of other penalties or sanctions (the federal court disbarment).
In light of respondent's misconduct and the relevant mitigating factors, particularly an otherwise unblemished career, the committee recommend respondent be suspended from the practice of law for three years, retroactive to the date of his interim suspension, with eighteen months deferred, followed by two years of probation with conditions.
Neither respondent nor the ODC objected to the committee's recommendation.

Disciplinary Board Report
A panel of the board reviewed this matter on March 18, 1999. Respondent did not appear, and the ODC argued in favor of the recommended sanction.
In its report, the board concurred in the findings of the hearing committee that respondent is guilty of the misconduct set forth in the formal charges, and that the charges were proven by clear and convincing *945 evidence. The board agreed with these factual findings and found them not to be manifestly erroneous. The board determined respondent violated duties owed to his client, the legal system, and the profession, and that respondent engaged in knowing and intentional misconduct. The board also found the same aggravating and mitigating circumstances as those determined by the hearing committee.
However, considering the facts and circumstances presented, the board disagreed with the sanction recommended by the hearing committee and concluded that disbarment is the baseline sanction under Hinrichs. The board found that respondent commingled and converted the $982 "med pay" check, engaged in fraud, deceit, dishonesty, and misrepresentation, and willfully concealed material facts from a tribunal. The board found the hearing committee did not take into account all the factors outlined in Rule XIX, § 10(C) when making its recommendation of the appropriate sanction.[3] In light of respondent's misconduct and the significant aggravating factors, the board concluded there is no reason to deviate from the baseline sanction and that disbarment is the appropriate sanction to be imposed in this case.
Accordingly, the board recommended that respondent be disbarred from the practice of law, effective from the date of his interim suspension. The board also recommended that respondent be assessed with all costs and expenses of these proceedings, with legal interest to commence running thirty days from the date of finality of the court judgment until paid.
Respondent filed an objection in this court to the disciplinary board's recommendation, and the matter was set on the court's docket for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b). The ODC did not object to the sanction proposed by the board.

DISCUSSION
We recognize that the federal court which presided over the underlying Bragg litigation concluded that respondent intentionally and deliberately overcharged his client for expenses, and that he forged the endorsements on the "med pay" check in order to deposit the check into his personal account. Nonetheless, these findings are not binding on this court. We are obligated to conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343 (citing Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992), and Supreme Court Rule XIX, § 18(C)). Accordingly, we now turn to a review of the record to determine if the evidence presented at the formal hearing establishes respondent's misconduct by clear and convincing evidence.

SUMMARY OF THE FORMAL HEARING

Testimony of Respondent
Respondent testified that he and Mr. Schmidt agreed to work together on the Bragg matter, with respondent handling primarily the litigation aspects of the case and Mr. Schmidt, who had recently been admitted to the practice of law, dealing primarily with the client. After a partial settlement was reached in the case, respondent and Mr. Schmidt met to disburse the settlement. Respondent testified that he went to Mr. Schmidt's office and gave him a disbursement sheet showing the attorney's *946 fee and a preliminary statement of costs.[4] Respondent received two checks from Mr. Schmidt, one for his portion of the attorney's fee and one for his costs. The second check included respondent's costs to that point in time, plus a $1,000 advance on future costs. Respondent testified that Mr. Schmidt later stole the Bragg file from his office, telling his secretary that he was bringing the file to a meeting with respondent and one of Mr. Bragg's treating physicians. The following week, respondent received a letter from Mr. Bragg discharging him as counsel.
Respondent testified that the theft of the file by Mr. Schmidt made it very difficult for him to prepare a final costs statement, because the documentation of all the costs had been kept in the file and all he had to go by was the preliminary costs statement he had earlier submitted to Mr. Schmidt. He also testified that Mr. Schmidt refused to honor their contract, which entitled him to 40% of the attorney's fee and permitted him to recover "all costs" he had advanced in the matter. Respondent therefore filed an intervention claim for his portion of the attorney's fee and for the remaining costs which he had not been paid. Respondent pointed out that the court ultimately awarded him his fee and some of the costs, but disallowed other costs.[5]
Concerning the "med pay" check, respondent testified that he placed the check in the Bragg costs file after he received it, and that the check was still in the file when Mr. Schmidt took the file from the office. However, respondent could not recall when he received the check. He denied endorsing or negotiating the check, or having Mr. Bragg or Mr. Schmidt endorse it. Respondent also denied any knowledge of the deposit of the check to his personal checking account, and he contended that Mr. Schmidt made the deposit.

Testimony of Yvonne Burst
Ms. Burst was respondent's legal secretary from 1992 until the end of 1995. She testified that Mr. Schmidt, an attorney who shared office space with respondent, was the attorney initially involved in the Bragg case. Respondent's association in the Bragg matter was terminated after respondent and Mr. Schmidt had a disagreement about fees and costs. According to Ms. Burst, Mr. Schmidt felt that some of the costs had been "padded," and later there was a question about a medical payments check that came into the office that was not credited to the client's account. Ms. Burst testified that she was responsible for the costs statements, which she prepared from various sources, including bills that were received and checks that had been written. When a client's statement was ready to be billed, Ms. Burst said that she would first print out a copy for respondent to review. If respondent made any changes to a bill, including increasing an item, she made the changes without questioning him. Ms. Burst also testified that she was responsible for making deposits into respondent's operating and trust accounts.
Concerning the $982 medical payments check from State Farm Insurance Company, Ms. Burst testified that she saw the *947 check on respondent's desk, along with the Bragg file. Respondent did not give the check to her for posting, and he did not give her a receipt for the item to show that he deposited it. Ms. Burst said she knew the check was not deposited into the trust account, but thought the check was determined to have been deposited to respondent's personal account. She also testified that Mr. Schmidt claimed he had not endorsed the check. Ms. Burst testified that she did not know what happened to the check after Mr. Schmidt removed the file from respondent's office, under the pretense that he needed to bring the entire file to respondent.
On cross-examination, Ms. Burst admitted that it was difficult for her to "double check" the costs statement in the Bragg matter after Mr. Schmidt removed the file from the office. She testified it was her practice to document every item for which she had a receipt; postage was figured manually and she tried to "guesstimate" how many copies she had made. However, without access to the receipts which had been in the file, Ms. Burst testified that she could only estimate what the final costs were, based on her computer records. She also testified that she thought the "med pay" check was paper-clipped to the costs file at the time Mr. Schmidt removed it from the office.

Testimony of Hillary Thomas Murphy
Mr. Murphy shared office space with respondent and worked on some breast implant litigation with him; however, he was not involved in the Bragg matter. The Bragg file and others were stored in his office in a file cabinet, and Mr. Murphy testified that he was aware of the allegation that Mr. Schmidt came into the office and stole ten files, including the Bragg file.

Testimony of F. Evans Schmidt
Mr. Schmidt testified that he shared office space with respondent for more than a year and a half, beginning in 1993. During that time, he and respondent worked together on several cases on a fee-split basis, including the Bragg matter. Mr. Schmidt testified that he was the trial attorney on the Bragg case, and he asked respondent if he would like to work on that case with him. Respondent consented, and the two lawyers agreed that respondent would pay all the costs associated with the case and would handle the typing of pleadings and other administrative matters in exchange for 40% of the attorney's fees. After a partial settlement was reached in the case, respondent submitted to Mr. Schmidt a statement for $4,978.20 in costs he had already incurred, and he requested a $1,000 advance on future costs. Mr. Schmidt testified that he drew two checks from his client trust account payable to respondent, and asked respondent for an accounting, which he promised to provide but never did. Mr. Schmidt said he became very anxious about the matter, because the more he thought about it, the more he realized that there could not have been almost $5,000 in expenses. After a week of respondent's "stonewalling" on the accounting, Mr. Schmidt testified that he discussed his concerns with the client. Mr. Schmidt stated that the client instructed him to get the file, so he went to respondent's office on December 5, 1994 and retrieved the file from Ms. Burst.[6] Mr. Schmidt denied telling Ms. Burst that he needed the file to bring it to respondent; according to Mr. Schmidt, it was his case and he offered no explanation to the secretary as to why he wanted the file. After reviewing the file and respondent's accounting, Mr. Schmidt realized that some of the charges posted to the client's cost account were inappropriate or inflated. He discussed the matter with the client, and the client subsequently discharged respondent.
Mr. Schmidt also testified that the original "med pay" check was not in the Bragg file when he retrieved it from respondent's office. Mr. Schmidt said that he had no *948 knowledge the check had even been issued until he saw State Farm's records, which were subpoenaed during the hearing before the federal magistrate judge. Mr. Schmidt denied that he had ever endorsed the check or that he had ever attempted to negotiate the check.

ODC's Exhibits
The ODC presented ten exhibits in support of the formal charges, including Mr. Schmidt's initial and supplemental complaints, respondent's initial and supplemental responses, transcripts of the hearings conducted by the federal magistrate judge in the intervention proceeding, and the findings and recommendations in the federal disbarment proceeding issued by U.S. District Court Judge G. Thomas Porteous, Jr.

ANALYSIS
Based on our independent review, we find the ODC presented clear and convincing evidence that respondent deliberately attempted to overcharge his client by "padding" certain legitimate expenses and charging for fictitious expenses. Additionally, the record clearly and convincingly demonstrates respondent converted the $982 "med pay" check issued to his client.
As the hearing committee found, respondent's defense to these charges is simply not credible. For example, respondent attempted to explain the numerous overcharges and fictitious charges by suggesting that they were "mistakes." However, it defies belief that so many "mistakes" could occur in favor of respondent, and none in favor of his client. Moreover, even assuming respondent did not have access to his file at the time he prepared the costs statement, many of these charges could have been easily verified if respondent had taken the time to contact the service providers.
Respondent further suggests the $982 check was stolen by Mr. Schmidt and deposited into respondent's account in an attempt to frame respondent. However, the testimony of Mr. Schmidt plainly contradicts respondent's defense. Additionally, we note the record reveals that at the time the $982 check was deposited into respondent's account, he was suffering from financial difficulties, and his account had a balance of $14.96. One day after the check was deposited, respondent wrote a check in the amount of $633.34 for a past due loan payment. At the very least, this demonstrates respondent had a clear motivation to fraudulently deposit the check into his personal account.[7]
Accordingly, based on our independent review of the record, we find the ODC proved by clear and convincing evidence that respondent violated Rules 1.5(c), 1.15(a)(b)(c), 3.3(a)(2), and 8.4(a)(b)(c), as alleged in the formal charges.

DISCIPLINE
Having found respondent committed professional misconduct, we now must impose the appropriate discipline for his actions. In determining an appropriate sanction, we are mindful that the purpose of lawyer disciplinary proceedings is not primarily to punish the lawyer, but rather to maintain appropriate standards of professional conduct to safeguard the public, to preserve the integrity of the legal profession, and to deter other lawyers from engaging in violations of the standards of the profession. Louisiana State Bar Ass'n v. Guidry, 571 So.2d 161 (La.1990).
Respondent's misconduct involves numerous instances of bad faith overcharges and fictitious charges to his client's account. Such charges, while consisting of relatively small amounts when considered individually, have a clear potential *949 to harm the client, since it is unlikely the client would have sufficient knowledge of the nature of the charges to realize he was being overcharged. Rather than acting in his client's best interest, as required by the professional rules, respondent sought to "pad" the expense charges for his own benefit and to the detriment of his client.
Respondent's forgery of endorsements on the "med pay" check is also highly troubling. Even accepting respondent's contention that he was ultimately entitled to the funds, his failure to follow proper and accepted methods for handling the funds harms the integrity and standards of the profession.
In Hinrichs, we found disbarment is appropriate when a lawyer acts in bad faith and intends a result inconsistent with his client's interest, or when the lawyer commits forgery or other fraudulent acts in connection with the violation. Respondent's conduct in the instant matter implicates both of these considerations.
Accordingly, we will accept the disciplinary board's recommendation of disbarment.

DECREE
Upon review of the findings and recommendation of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that the name of A. Gill Dyer be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked, effective the date of his interim suspension. All costs and expenses in this matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
NOTES
[*] Calogero, C.J., not on panel. Rule IV, Part II, § 3.
[1] After the formal charges were filed, respondent and the ODC filed a joint petition for interim suspension, which was granted by this court on February 11, 1998. In re: Dyer, 98-0332 (La.2/11/98), 706 So.2d 983.
[2] expense item Amount Dyer charged Disallowed amount
Administrative charge to open file $ 200.00 $ 200.00
Photocopy charges $ 395.50 $ 339.15
Fax charges $ 100.00 $ 100.00
Postage $ 150.00 $ 121.00
Telephone charges $ 590.00 $ 90.00
Airborne Express $ 526.20 $ 26.20
Legal Wings $ 237.50 $ 200.00
MRI $ 2,195.00 $ 396.00
Chad Millet, M.D. $ 750.00 $ 300.00
Filing fee $ 120.00 $ 120.00
Deposition (Lott & Machella) $ 569.00 $ 108.00
Deposition (Lavergne) $ 261.15 $ 100.00
Service of subpoenas $ 450.00 $ 450.00
Parking and mileage $ 32.00 $ 32.00
TMAC videotape $ 699.00 $ 699.00
 __________ __________
 $ 6,275.35 $ 3,281.41

[3] Supreme Court Rule XIX, § 10(C), provides: Factors to be Considered in Imposing Sanctions. In imposing a sanction after a finding of lawyer misconduct, the court or board shall consider the following factors:

(1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
(2) whether the lawyer acted intentionally, knowingly, or negligently;
(3) the amount of the actual or potential injury caused by the lawyer's misconduct; and
(4) the existence of any aggravating or mitigating factors.
[4] Respondent explained that the costs statement was only preliminary because the litigation was still ongoing, i.e., other costs which had been incurred were not included on the statement because two defendants still remained in the suit. Respondent stated that he intended to make a final accounting at the conclusion of the matter.
[5] Respondent has suggested that some of the disputed expense items, including photocopies, faxes, and the file opening fee, were disallowed because the federal magistrate judge thought they should be part of respondent's overhead. Some of the items, including service of subpoenas and parking and mileage, were disallowed because they were undocumented. Respondent claimed he could not verify other items, including the TMAC videotape and the MRI expense, before he submitted the costs statement because Mr. Schmidt had already removed the Bragg file from his office. Respondent admitted that $300 of Dr. Millet's charge, $200 of the Legal Wings charge, and $208 of the deposition charges were in error and properly disallowed.
[6] At this point, respondent and Mr. Schmidt were no longer sharing office space. However, the files that the two lawyers worked on together, including the Bragg matter, were housed in respondent's office because his secretary did all the typing and filing.
[7] In oral argument before this court, respondent's attorney suggested that since the check represented reimbursement for funds respondent advanced to his client, these funds ultimately belonged to respondent. Even assuming respondent was entitled to the funds, we are unaware of any rule of law which would allow him to forge the endorsements of his client and co-counsel and to deposit the check into his personal account.