In re Karen P. CLEAVER–BASCOMBE, Respondent.

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 458922).**

**No. 04–BG–1540.**

District of Columbia Court of Appeals.

Argued Nov. 8, 2005.
Decided Feb. 9, 2006.

John O. Iweanoge, Jr., Washington, DC, for Respondent.

Joseph N. Bowman, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before SCHWELB and GLICKMAN, Associate Judges, and STEADMAN, Senior Judge.

SCHWELB, Associate Judge:

This case involves the alleged falsification of a voucher by an attorney who had been appointed to represent an indigent criminal defendant pursuant to the Criminal Justice Act (CJA), D.C.Code §§ 11–2601 et seq. (2001). Essentially, Respondent Karen P. Cleaver–Bascombe, a member of our Bar since 1998, is alleged to have sought compensation for work that she knew she had not done. Although several issues are presented, the most significant one pertains to the imposition of an appropriate sanction. The Board on Professional Responsibility has recommended that Respondent be suspended from practice for ninety days, with reinstatement conditioned upon Respondent's successful completion of a Continuing Legal Education (CLE) course on timekeeping and related record-keeping. Bar Counsel initially took the position that Respondent should be disbarred, but now urges the court to suspend Respondent from practice for one year, with reinstatement conditioned upon proof of fitness to practice.[1]

The allegations in this case are extremely serious. The compensation of attorneys who represent criminal defendants in the District of Columbia courts pursuant to the Criminal Justice Act is based upon the assumption that members of our Bar are honorable men and women who will accurately report the work that they have done, and who will not demean their noble calling and bring disgrace to themselves and to their profession by swearing that they performed work that they did not do. Attorneys who accept CJA appointments are therefore expected to be scrupulously honest and to exercise a high degree of care in completing their vouchers, which are paid out of taxpayer funds, and which are submitted to the court under penalty of perjury. Where an attorney has deliberately falsified a voucher and sought compensation for work that he or she has not performed, or for time that he or she has not devoted to the case, that attorney's fitness to practice is called into serious question. This is especially true if the attorney has compounded his or her initial fraud by testifying falsely during the resulting disciplinary proceedings.

In the present case, the Board, as well as Hearing Committee Number Seven, were called upon to determine the truth or falsity of Respondent's claims in her voucher. The Board essentially adopted the Hearing Committee's findings of fact. In the first part of its Report, the Board found that Respondent included in her voucher, inter alia, claims for a meeting with her client at the District of Columbia Jail, and for several telephone conversations with him, even though she knew that this meeting and the telephone conversations did not take place. The Board therefore concluded that Respondent submitted "a patently fraudulent voucher." Later in its Report, however, the Board turned its attention to Respondent's testimony before the Hearing Committee. Testifying in her own defense, Respondent swore that the meeting and conversations claimed in her voucher did take place, and she described the meeting at the jail, and to some extent her telephone conversations with her

1. Respondent contends that Bar Counsel has failed to prove any violations by her of the Rules of Professional Conduct and that Respondent therefore should not be sanctioned at all. In the alternative, Respondent proposes a reprimand or, in the alternative, a thirty-day suspension. Any suspension, she argues, should be stayed pending a period of probation.

client, in elaborate detail. The Board nevertheless "agree[d] with Respondent that the [Hearing] Committee's findings do not support a conclusion that [Respondent] presented false evidence or testimony." Moreover, the Board recommended that the court impose the discipline proposed by the Hearing Committee—a ninety-day suspension, with reinstatement conditioned on successful completion of a CLE course in timekeeping and record-keeping. This sanction appears to be a remedy more suited for a lawyer whose inaccurate and inflated voucher is due to unacceptably poor record-keeping than it is for one who deliberately submitted a fraudulent voucher and then attempted to cover up her misconduct by lying under oath.

Because Respondent swore to essentially the same propositions in her voucher and in her testimony, we are constrained to conclude that the Board's finding that the voucher was intentionally false and patently fraudulent is difficult, if not impossible, to reconcile with its later treatment of Respondent's testimony as not having been proved to be deliberately false. This is important, for although deliberate fraud and reckless disregard of consequences are both altogether unacceptable, the intentional fabrication of a voucher and of testimony before the Hearing Committee, with the intent to defraud the CJA Fund, may differ materially even from recklessly incompetent record-keeping where the attorney's reckless misconduct did not entail an intent to defraud or deliberate lying under oath.

In fashioning the appropriate discipline in this case, we must clearly understand which of these two kinds of misconduct Bar Counsel has proved by clear and convincing evidence. Accordingly, we remand the case to the Board for a resolution of the tension which we have identified between the Board's various findings.

## I.

## PROCEDURAL BACKGROUND

On February 14, 2002, Respondent was appointed by the Superior Court to represent Donald C. Whitley, an indigent defendant,[2] at his arraignment in an extradition matter. Whitley's case arose out of a fraud charge which was allegedly pending against him in Charles County, Maryland. Whitley claimed that he was not the individual sought by Charles County authorities, and he asked Respondent to contest the requested extradition. The court imposed a $1,000 cash bond and committed Whitley to the District of Columbia Jail until such time as he was able to post bond. A status hearing was scheduled for March 20, 2002. Whitley posted bond on February 16, 2002, and he was duly released upon doing so. On March 20, 2002, the United States moved to dismiss the case against Whitley, and the court granted the motion.

On February 19, 2002, the Superior Court issued a "form" voucher to Respondent in order to enable her to apply for and receive payment for her services in representing Whitley. The voucher included spaces and sections for Respondent's use in itemizing her time, expenses, and requested compensation. Before submitting the voucher to the court for payment, Respondent was required to certify under oath that the contents thereof were true and correct.

---

**2.** Whitley acknowledged before the Hearing Committee that in the form he completed in order to demonstrate his eligibility for representation by an attorney to be appointed pursuant to the CJA, he lied under oath regarding his employment and marital status. He did not, however, falsify his salary.

On March 21, 2002, the day following the dismissal of the extradition case, Respondent submitted her voucher for fourteen and one-half hours of legal services. She requested compensation, *inter alia*, for the following items, all of which have been contested by Bar Counsel:

1. a two-hour conference with Donald Whitley on February 15, 2002, at the District of Columbia Jail;

2. a one-hour telephone conference with Mr. Whitley on February 20, 2002;

3. a one-hour telephone conference with Mr. Whitley on March 14, 2002;

4. a one-hour telephone conference with Mr. Whitley on March 19, 2002;

5. the preparation of a letter to an Assistant United States Attorney for one and one-half hours on February 15, 2002;

6. a one and one-half hour discussion on March 14, 2002, with Ms. Koustenis, an employee of the Charles County Warrant Office;

7. the review for one hour on March 19, 2002, of the government's motion to dismiss; and

8. the preparation for one and one-half hours of a "letter of instruction" to Mr. Whitley.

Respondent requested compensation in the total amount of $725. The parties evidently agree that the presumptive maximum for an extradition case is $1300, although the record does not reveal whether the underlying fraud charge against Whitley was a felony or a misdemeanor.[3]

On April 5, 2002, upon receiving Respondent's voucher, the late Judge Steffen W. Graae, the presiding judge in Whitley's case, advised Respondent by letter that the claims in her voucher "raise serious concerns." The judge directed Respondent to call his administrative assistant to make an appointment with the judge, and he asked her to "[p]lease bring your case file when you come." Judge Graae further stated in his letter that if he did not hear from Respondent within ten days, he would authorize payment of whatever amount the judge deemed appropriate. On May 13, 2002, not having heard from Respondent,[4] Judge Graae wrote to her

---

3. Under the provisions of D.C.Code § 11–2604(b) and (c)(2001), the presumptive statutory maximum is $2450 for a felony and $1300 for a misdemeanor. A greater amount is permissible if the representation is unusually extended or complex. In her voucher, Respondent requested substantially less compensation than the maximum even for a misdemeanor.

In her testimony before the Hearing Committee, Respondent described the preparation that had to be done in an extradition proceeding:

> [T]ypically on an extradition case, if the defendant decides to waive, I have had extradition cases being as little as, I guess, now it is $97.50 to about $200, $300. [In] a case where the extradition is a hearing is held, [i]t is basically like any other trial. You prepare, you would do investigation, you would prepare for that hearing in the same way that you prepare for a trial so it would require that, A, know your facts,

know them from the defendant through interviews, follow up with the demanding jurisdiction, find out all that you can about the underlying matter, obtain any and all proof that might be out there, sometimes there are arrest photos and things like that to back up that the defendant is, in fact, the person that the demanding jurisdiction says he is, so essentially with the contested extradition, it is not terribly different from preparing for a trial. There is a good deal of background work to do, there is a good deal of investigation, and certainly you have to speak to the client.

Respondent also testified that this was her first contested extradition case.

4. Respondent testified that she did not receive the April 5 letter for several weeks because she failed to pick up her mail while she was engaged in a lengthy trial. She further described certain subsequent conversations which she claimed to have had with Judge

again. In his second letter, the judge informed Respondent that he had decided not to approve the voucher in any amount, and that he would instead refer the matter to Bar Counsel. The judge made the referral on the same date.

Fourteen months later, on July 14, 2003, Bar Counsel filed a Petition and accompanying Specification of Charges alleging that Respondent had violated the Rules of Professional Conduct

1. by charging an unreasonable fee, in violation of Rule 1.5(a);

2. by making false statements of material fact to a tribunal, in violation of Rule 3.3(a)(1);

3. by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of Rule 8.4(c); and

4. by engaging in conduct prejudicial to the administration of justice, in violation of Rule 8.4(d).

An evidentiary hearing was held before the Hearing Committee on September 12 and 17, 2003. On May 5, 2004, the Committee issued its Report and Recommendation. The Committee found by clear and convincing evidence that Respondent had charged an unreasonable fee (in violation of Rule 1.5(a)) and that she had engaged in conduct involving dishonesty (in violation of Rule 8.4(c)). The Committee concluded, however, that Bar Counsel had failed to prove that Respondent had made false statements to a tribunal or that she had engaged in conduct prejudicial to the administration of justice. The Committee recommended that Respondent be suspended from practice for ninety days and that, as a condition of reinstatement, she be required to complete successfully a

CLE course in timekeeping and record-keeping.

Respondent excepted both to the Hearing Committee's findings and to the proposed discipline. Bar Counsel excepted to the Committee's finding that Respondent had not violated Rules 3.3(a)(1) and 8.4(d), and also objected to the recommended sanction, contending that it was not commensurate with Respondent's misconduct. On December 17, 2004, the Board issued its Report and Recommendation. The Board concluded that Bar Counsel had proved by clear and convincing evidence that Respondent violated all four Rules of Professional Conduct cited in the Specification of Charges. The Board adopted the findings of the Hearing Committee, as well as the Committee's recommended sanction. Both Respondent and Bar Counsel filed exceptions, and Bar Counsel now asks this court to order that Respondent be suspended for one year and that she be required to prove fitness to practice as a condition of reinstatement. Respondent continues to deny that she violated any of the Rules of Professional Conduct.

## II.

### STANDARD OF REVIEW

In disciplinary cases, the Board must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record. This court, in turn, must accept the Board's findings of fact, and we also apply the "substantial evidence" standard. *See* D.C. Bar R. XI, § 9(g); *In re Berryman,* 764 A.2d 760, 766 (D.C.2000); *In re Micheel,* 610 A.2d 231, 234 (D.C.1992); *In re Cooper,* 591 A.2d 1292, 1294 (D.C.1991). We review the

---

Graae's judicial administrative assistant. The assistant testified at the hearing and contradicted Respondent's testimony, and the Hear-

ing Committee did not credit Respondent's account.

Board's conclusions of law *de novo. In re Fair,* 780 A.2d 1106, 1110–11 (D.C.2001); *In re Berryman,* 764 A.2d at 766; *In re Micheel,* 610 A.2d at 234.

We must impose the discipline recommended by the Board "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(g)(1). In *In re Soininen,* 853 A.2d 712, 723 (D.C.2004), we stated:

[Section 9(g)(1)] "endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise." *In re Arneja,* 790 A.2d 552, 558 (D.C.2002) (citations omitted). The Board's recommended sanction thus "comes to the court with a strong presumption in favor of its imposition." *In re Hallmark,* 831 A.2d 366, 371 (D.C. 2003). " 'Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed.' " *Id.* (quoting *In re Goffe,* 641 A.2d 458, 463–64 (D.C.1994)).

But "[a]lthough we must give considerable deference to the Board's recommendations in these matters, the responsibility for imposing sanctions rests with this court in the first instance." *In re Temple,* 629 A.2d 1203, 1207 (D.C.1993). Further, where "this court has had little occasion to pass upon conduct such as was involved in that case and here, and therefore our role in reviewing the Board's recommendation may be more assertive than in more familiar types of misconduct." *In re Schneider,* 553 A.2d 206, 211 (D.C.1989) (brackets and ellipsis omitted). We also note that this is apparently the first case in which this court has been called upon to determine the appropriate sanction for filing a false or inflated voucher. "Since this is the first occasion for this court to pass upon conduct like that of [Respondent], there are no other cases of fully comparable conduct with which we must maintain consistency." *In re Reback,* 513 A.2d 226, 230 (D.C.1986) (en banc).

### III.

### RESPONDENT'S EXCEPTIONS

Respondent's basic position before this court is the same as her position before the Hearing Committee and before the Board. She contends that her voucher was legitimate and accurate, that Bar Counsel failed to prove by clear and convincing evidence that she violated any Rule of Professional Conduct, and that the findings of the Hearing Committee and of the Board to the contrary are not supported by substantial evidence in the record. We disagree. In this case, "the Board has upheld the findings of the Committee, and these findings turn in substantial part on credibility determinations which we are in no position to second-guess." *In re Shillaire,* 597 A.2d 913, 916 (D.C.1991); *see also In re S.G.,* 581 A.2d 771, 775 (D.C. 1990). The Board "f[ound] *all* of the Committee's factual determinations to be supported by substantial evidence." So do we.[5]

Having rejected Respondent's position that the Hearing Committee's findings lack adequate support in the record, we turn briefly to Respondent's legal contentions with respect to the Board's conclusion that she violated each of the specified Rules of Professional Conduct.

---

**5.** To the extent that findings by the Hearing Committee or by the Board may be inconsistent with one another, see Part V, *infra,* there is substantial evidence in the record to support all of them, regardless of how any inconsistencies are resolved.

A. *Rule 1.5(a)—Charging an Unreasonable Fee.*

■ The prototypical circumstance of charging an unreasonable fee is undoubtedly one in which an attorney did the work that he or she claimed to have done, but charged the client too much for doing it. This case is different, for the allegation is that Respondent sought compensation for work that she did not do at all. Nevertheless, the Hearing Committee and the Board both concluded that charging *any* fee for work that has not been performed is *per se* unreasonable. We agree. It cannot be reasonable to demand payment for work that an attorney has not in fact done.

■ Respondent claims that she did not violate this Rule because she never collected the fee. We do not believe that failure to receive the money negates the fact that she *charged* an unreasonable fee. To the contrary, we hold, as did the Board, that

Rule 1.5(a) can be violated by the act of charging an unreasonable fee without regard to whether the fee is collected. Respondent's submission of a false CJA voucher violates our Rule 1.5(a).

*See In re Waller,* 524 A.2d 748, 749 (D.C. 1987).[6]

B. *Rule 3.3(a)(1)—Making a False Statement of Material Fact to a Tribunal.*

■ Urging us to adopt a position taken by the Hearing Committee, Respondent claims that she did not make a false statement of fact or law to a tribunal in violation of Rule 3.3(a). She argues that even if the contents of her voucher were false—an allegation which she continues to deny—"voucher approval... by the [c]ourts' Financial Operations Division is not a judicial function and neither would it be, in good faith, classified as a quasi-judicial function."

The Board disposed of this contention persuasively, and, subject to the discussion in Part V, *infra,* we adopt the Board's position:

We have found no decisions that define "tribunal" as used in Rule 3.3(a)(1). The "Terminology" section of the D.C. Rules of Professional Conduct defines "tribunal" as "[d]enot[ing] a court, regulatory agency, commission, and any other body or individual authorized by law to render a decision of a judicial or quasi-judicial nature, based on information presented before it, regardless of the degree of formality or informality of the proceedings." *Id.* at 16. The Committee opined that neither the Accounting Branch of the Superior Court nor Judge Graae functioned as a "tribunal" under this definition when processing the voucher, approving payment or making payment to the attorney. We see it differently.

Bar Counsel argues that the Criminal Justice Act directs lawyers to submit claims for compensation to "the Superior Court" which is clearly a tribunal. *Id.*

---

**6.** We also agree with the following discussion by the Board regarding the limits of Rule 1.5(a)'s reach:

Respondent argues that our reading would mean that every attorney whose CJA voucher is reduced has violated Rule 1.5(a). We disagree. Superior Court Judges may have many reasons for reducing voucher payments, including taking more time than is necessary to perform a task or making mathematical errors in billing. Not all such instances rise to the level of charging an excessive fee. Our finding that Respondent violated Rule 1.5(a) may be read to suggest only that an attorney who submits a CJA voucher for payment for work not actually performed has violated Rule 1.5(a). Accordingly, we agree with the Committee that Respondent violated Rule 1.5(a) by submitting a voucher that included charges for work she did not perform.

(citing D.C.Code § 11–2604(d)). Respondent argues that the District of Columbia Courts' Financial Operations Division is responsible for the processing and payment of CJA vouchers and this administrative body is not a tribunal.

As an experienced CJA Attorney, Respondent knew that Judge Graae had to approve her voucher as the judge presiding over the extradition of Respondent's client. On that voucher, she swore and affirmed the truth and correctness of statements that the Committee found that she knew to be false. We are not called upon to determine whether there are any departments within the Superior Court that do not have the authority to act in a judicial or quasi-judicial nature. Judge Graae has this authority, and he exercised it in reviewing Respondent's CJA voucher. Accordingly, we find that Respondent violated Rule 3.3(a)(1) by submitting a CJA voucher to the [c]ourt for payment knowing it to contain charges for work not performed.

### C. *Rule 8.4(c)—Dishonesty.*

We agree with the Board that the term "dishonesty," while encompassing fraud, deceit, and misrepresentation, also includes "conduct evincing a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness." *In re Shorter*, 570 A.2d 760, 767–68 (D.C. 1990) (per curiam) (citations omitted). When an attorney, as alleged here, deliberately and knowingly makes a false representation in her CJA voucher, she violates Rule 8.4(c). *See In re Schneider*, 553 A.2d at 209. Moreover, an attorney who recklessly maintains inadequate time records, and consciously disregards the risk that she may overcharge a client (or here, the CJA fund), also engages in dishonesty within the meaning of Rule 8.4(c). *See In re Romansky*, 825 A.2d 311, 317 (D.C. 2003).

### D. *Rule 8.4(d)—Conduct that Seriously Interferes with the Administration of Justice.*

Rule 8.4(d) proscribes conduct that "seriously interferes with the administration of justice." To establish a violation of Rule 8.4(d), Bar Counsel must demonstrate by clear and convincing evidence that:

1. Respondents's conduct was improper, *i.e.*, that Respondent either acted or failed to act when she should have;

2. Respondent's conduct bore directly upon the judicial process with respect to an identifiable case or tribunal; and

3. Respondent's conduct tainted the judicial process in more that a *de minimis* way, *i.e.*, it must have potentially had an impact upon the process to a serious and adverse degree.

*In re Hopkins*, 677 A.2d 55, 60–61 (D.C. 1996). The Hearing Committee found that Bar Counsel did not prove a violation by Respondent of Rule 8.4(d); the Board reached the opposite conclusion.

We agree with the Board that the CJA program is a part of the judicial process for purposes of this Rule:

*Hopkins* requires that an attorney's misconduct "bear directly upon the judicial process ... with respect to an identifiable case or tribunal." *Hopkins*, 677 A.2d at 61. The CJA program is an integral part of the judicial process of the Courts of the District of Columbia and conduct that affects this program satisfies this requirement of Rule 8.4(d). Under statutes that regulate the CJA program, the power to appoint and pay lawyers is vested in the Superior Court and its judges. D.C.Code § 11–2601 *et*

*seq.* The Court of Appeals has found that the appointment of counsel under the CJA is a judicial act for which trial judges and the [c]ourt employees who administer the program on their behalf enjoy judicial immunity. *Stanton v. Chase,* 497 A.2d 1066, 1068–69 (D.C. 1985). Because the payment of attorneys under the act is directly vested with the [c]ourt's judges, we find that the evaluation and approval of attorneys' vouchers under the program is judicial in nature. Hence, conduct that impacts on the CJA program bears upon the judicial processes of the appointing court.

■ We also agree with the Board that Bar Counsel has satisfied the third prong of *Hopkins, i.e.,* proved, by clear and convincing evidence, that Respondent's conduct tainted the judicial process in more than a *de minimis* way. The Board concluded that Respondent's actions sufficiently tainted the process, because "[i]n our view, the submission of a patently fraudulent voucher has this effect." Although portions of the Board's Report appear to be in tension with the description of the voucher as "patently fraudulent," Respondent, at the minimum, submitted a voucher with reckless disregard for the truth of its contents. Whether Respondent acted with intent to defraud or recklessly, the consequences for the judicial process of the submission of a false voucher were more than minimal.

## IV.

### BAR COUNSEL'S EXCEPTION

Bar Counsel's exception to the Board's Report and Recommendation is directed solely to the discipline proposed by the Board. Having initially sought Respondent's disbarment, Bar Counsel now urges the court to impose a one-year suspension, and asks that we require Respondent to prove her fitness to practice as a condition of reinstatement. In our view, the appropriate sanction may turn on the resolution of what we perceive to be potential inconsistencies in the findings of the Board.

Before addressing these apparent contradictions, we briefly describe the specific claims in Respondent's voucher and testimony which have been disputed by Bar Counsel in these proceedings.

### A. *The factual issues.*

(1) *Respondent's alleged visit to the jail.*

Respondent claimed in her voucher that on February 15, 2002, the day after Whitley's arraignment, she visited him at the District of Columbia Jail and conferred with him there. Respondent testified that on this visit, she was accompanied by her investigator, Jocelyn Brown. Respondent ostensibly recalled the visit in some detail, and described conversations that took place (*e.g.,* a bantering exchange with a jail guard regarding her pregnancy).

Whitley testified, however, that neither Respondent nor Jocelyn Brown[7] visited him at the jail at all. Moreover, the Board found:

All visitors to the D.C. Jail, including attorneys and investigators, are required to sign a visitors' register when they enter the jail. Moreover, attorneys wishing to visit clients at the jail are required to submit an Inmate Request Form to jail authorities to request a visit with an inmate. A review of the D.C.

7. Curiously, neither Bar Counsel nor Respondent called Ms. Brown as a witness, even though Ms. Brown could be expected to know whether or not this alleged visit to the jail actually occurred. Whether or not Respondent went to the jail on February 15, 2002, and interviewed Whitley there, was the most vigorously contested factual issue in this case.

Jail's visitor records and Inmate Request Forms reflects no record or verification that either Respondent or her investigator, Jocelyn Brown, was present at the D.C. Jail on February 15, 2002. Additionally, attorney visits are logged into a book on the floor in which the legal visit takes place.

Respondent offered the testimony of Howard Exum, a former prison guard who had previously been employed at the jail. Exum testified that on February 15 he worked overtime at the facility and that, on that date, he saw and spoke with Respondent and with Ms. Brown. Exum s evidence was contradicted by Department of Corrections records which apparently showed that he was not at the facility at the time Respondent claimed to have visited Whitley and that he was not paid overtime for the hours in question. There were also some significant inconsistencies between Respondent's testimony and Exum's. The Hearing Committee was unimpressed by Exum's memory and demeanor and did not credit his testimony. The Committee found that Bar Counsel had established by clear and convincing evidence that Respondent did not meet with Whitley at the jail on February 15, 2002. The Board adopted that finding.

(2) *Telephone conferences.*

In her voucher, Respondent claimed that she had three one-hour telephone conferences with Whitley on February 20, 2002, March 14, 2002, and March 19, 2002. The Hearing Committee and the Board, however, credited Whitley's testimony that Respondent had only one telephone confer-

ence with Whitley [8] on a date that he was unable to recall. According to Whitley, this conference lasted only a few minutes.[9]

On cross-examination by Respondent's counsel, Whitley acknowledged that he received a substantial amount of information from Respondent regarding the fraud case in Charles County that precipitated the extradition proceeding. He also admitted that he spoke with Respondent after receiving the instruction letter. According to Respondent, Whitley was a difficult and nervous client who required a good deal of "hand-holding" and reassurance, so that her discussions with him were protracted. See p. 22, *infra*. Nevertheless, the members of the Hearing Committee, each of whom questioned Respondent quite probingly, did not believe that Respondent spoke to Whitley as often, or for as long, as she claimed in her voucher to have done.

(3) *Letters and review of motion.*

In her voucher, Respondent also asserted that she spent one and one-half hours in drafting each of two brief letters, one letter of "instruction" to her client, the other a communication to an Assistant United States Attorney relating to discovery. Respondent testified that the letter to her client was prepared from 7:30 p.m. to 9:00 p.m. on February 15, 2002. Her calendar, however, contained a notation that the letter was drafted from 3:30 p.m. to 5:00 p.m. on the previous day. The Hearing Committee was obviously skeptical of Respondent's assertions regarding the time she claimed to have devoted to these letters,

---

8. On cross-examination, Whitley was less certain. He stated that "on the phone I talked to her or *remember talking to her* once." (Emphasis added.) He added that "I remember *at least* talking to her once." (Emphasis added.)

9. Respondent failed to produce any notes taken in connection with these alleged telephone conversations. She claimed that she gave all of her notes to Whitley. During Whitley's testimony Respondent's attorney made no attempt to cross-examine the witness regarding whether he had received Respondent's notes and was in possession of them.

but there was no specific finding by the Committee or by the Board as to whether or not these individual claims were false or inflated. The letters were, however, a part of the evidence on which the Committee and the Board relied in finding that Bar Counsel had proved dishonesty.[10]

(4) *Conversations with Charles County Warrant Office.*

Respondent also represented in her voucher that she had conversations with personnel of the Charles County, Maryland, Warrant Office that lasted one hour and thirty minutes. The Hearing Committee made the following findings with regard to this claim:

> Respondent claimed compensation for one hour and 30 minutes on March 14, 2002, for discussions with Ms. Koustenis of the Charles County, Maryland Warrant Office. The Committee finds that Respondent did not have a conversation with Ms. Koustenis on March 14, 2002. Rather, as Ms. Koustenis testified, she had only one conversation with Respondent, and that conversation was on March 20, 2002, and lasted for only a "very short time." Ms. Koustenis testified that the conversation was simply to confirm that Charles County was dismissing its warrant for Mr. Whitley's arrest. Ms. Koustenis remembered the telephone call after referring to the notes she took of messages she received on her voicemail and the notations she made when she returned the calls. Although the Committee finds incredible Ms. Koustenis' further testimony that she has never had a work-related conversation with anyone that lasted more than two minutes during the many years that she has been employed in the

Charles County Warrant Office, the Committee is satisfied that her notes concerning messages received and the returning of phone calls corroborate her testimony regarding her conversation with Respondent.

Respondent testified that when she contacted the Charles County Warrant Office, she was referred *seriatim* to a number of different people before she was finally able to speak to Ms. Koustenis. In its finding quoted above, the Hearing Committee does not appear to have come to grips with this testimony. Indeed, the Committee evidently viewed the issue as being whether Respondent's conversation with Ms. Koustenis alone took one and one-half hours. We think that it would have been helpful if the Committee had addressed Respondent's account directly. In the Board's view, however, "a reasonable mind can conclude [that] there is sufficient support for the conclusion reached by the Committee, even in the absence of a log of live conversations *and in the face of Respondent's alternative explanation.*" (Emphasis added.) We agree. Moreover, if the conversation between Respondent and Ms. Koustenis took place six days later than Respondent asserted that it did, the Hearing Committee could reasonably question the accuracy of Respondent's other representations as well.

(5) *Respondent's claim that she performed services for which she did not seek or receive compensation.*

Respondent asserted before the Hearing Committee that "I did a lot of work in this case I didn't bill for." She testified, and her voucher confirms, that she did not request compensation for any in-court

---

10. The Hearing Committee also noted Respondent's claim that she spent one hour reviewing the government's motion to dismiss. Neither the Committee nor the Board made a specific finding as to whether this claim was false, although the Committee was evidently quite dubious.

time, for travel to and from the jail,[11] for photocopying expenses, for waiting time in relation to her two court appearances, or for her cell block interview of Whitley. When Respondent was asked to explain why she did not seek compensation for some of the time she devoted to the case, she provided an answer which, while unresponsive, provided a vivid description of her representation of Whitley:

He called many, many times and we spoke many, many times. He—whenever I spoke to Mr. Whitley, I would say we would spend a good 10 minutes having him explain to me that he is not a criminal, he is not an idiot, he is not, you know, he is an intelligent man, he has been to the university and this sort of thing. He was very nervous. He was very confused. He didn't understand how this happened, how he could be in— he was very outraged about having been arrested and kept in prison for a couple of days.

Upon his release, I would say the following week, he contacted me from that point onward regularly. It was I that gave him information to contact Charles County, it was I that gave him the information to go to his bank and get the affidavit, which is the preprinted form that he would submit that would go to Charles County. And all of this came about from numerous and repeated calls to Charles County, to the prosecut[or's] office and eventually to Ms. Koustenis' office. Mr. Whitley, while I didn't necessarily record each and every phone call and the duration of each particular phone call, Mr. Whitley was one of—was somebody that every step of the way

demanded a full and thorough accounting what was going on, what did it mean, how will this affect his work, will this be on his record, and this sort of thing so he had a lot of concerns and he was very verbal and expressive about getting answers about voicing those concerns and getting answers to each and every concern that he had with this matter pending.

Neither the Hearing Committee nor the Board made a finding regarding the veracity of Respondent's testimony that she did not seek compensation for some of her work on this case.

B. *The apparently conflicting findings.*

As we have previously noted, both the Hearing Committee and the Board[12] decided almost all of the factual issues in this case in favor of Bar Counsel. At first blush, this appears to be true even with respect to whether Respondent intentionally and knowingly submitted a fraudulent voucher, *i.e.,* whether she knew that she had not done the work that she claimed to have performed. A careful reading of the Reports of the Hearing Committee and of the Board reveals, however, that the findings relating to Respondent's *voucher* are in tension with the Board's conclusion regarding Respondent's *testimony* with respect to the potentially critical question whether Respondent engaged in deliberate fabrication in order to obtain payment for work which she knew that she had not performed.

(1) *The Hearing Committee.*

The Hearing Committee found that Respondent intentionally filed a false voucher:

---

11. The claim that Respondent sought no compensation for travel time to which she was entitled presupposes, of course, that she actually traveled to the jail. The Hearing Committee and the Board effectively found that she did not.

12. In this case, the Board adopted, and to some extent interpreted, the factual findings of the Hearing Committee.

The Hearing Committee finds on the record before it that Respondent knowingly billed the [c]ourt for services that she did not perform in Mr. Whitley's case. In signing the voucher, she swore and affirmed the truth and correctness of her claim for compensation. She then submitted the voucher for these services to the administrative offices of the Superior Court for payment directly to her. Respondent's actions in doing so were intended to mislead the [c]ourt into believing that the vouchered legal services had been performed on behalf of Mr. Whitley. Her actions must be considered dishonest and therefore in violation of Rule 8.4(c).

The Committee also wrote that the "Respondent's testimony at the hearing was inconsistent with other testimony and documentation offered," and that her testimony "is not credible on several key points as noted above."

Notwithstanding the ostensibly categorical finding of deliberately dishonest conduct on Respondent's part, however, the Hearing Committee also appeared to take quite seriously, in the alternative, the possibility that Respondent's violations were negligent or reckless rather than willful:

Even if the Committee were to accept Respondent's argument that Bar Counsel has not made a showing of knowing or voluntary dishonesty, Respondent was still reckless in her submission of the voucher. Respondent did not keep adequate time records of her work on the case, as evidenced by her calendar notations, which were sporadic and imprecise. For example, Respondent's calendar indicated that she drafted a letter to Mr. Whitley on February 14, 2002 from 3:30—5:00 p.m. However, she testified that the letter was actually drafted on February 15, 2002 from 7:30—9:00 p.m. . . . In submitting the CJA voucher

in this case, Respondent disregarded the risk—inherent in her shoddy timekeeping practices—that the amounts claimed might well be inaccurate. Under these circumstances, we find that her conduct was, at a minimum, reckless and therefore dishonest in violation of Rule 8.4(c).

Moreover, in proposing a sanction, the Hearing Committee focused less on Respondent's dishonesty and intent to deceive in filing a fraudulent voucher and more on what it perceived to be the need to remedy Respondent's "shoddy" recordkeeping and "sporadic" and imprecise calendar notations. In declining to recommend that Respondent be required to prove fitness as a condition of reinstatement following a recommended ninety-day suspension, the Committee wrote that "Respondent has no history of discipline, *and nothing in the record reflects adversely on her present qualifications and competence to practice law.*" (Emphasis added.) This sentence is difficult to reconcile with the notion that Respondent deliberately submitted, under oath, a voucher for legal services that she knew she had not performed, and with a conclusion that she then falsely testified, again under oath, that she had performed these very services.

In addressing the appropriate discipline to be imposed, the Hearing Committee focused once again on Respondent's negligence or recklessness:

The Committee is concerned, however, that Respondent's haphazard timekeeping procedures in this case may well extend throughout her practice. Accordingly, we recommend, as a condition of reinstatement, that Respondent be required to complete a CLE course on timekeeping and related recordkeeping procedures.

In other words, the Hearing Committee recommended a comparatively brief suspension and suggested that, in order to be reinstated, Respondent should be required to demonstrate not that she is of good character and that she would not commit dishonest acts in the future, but rather that she had successfully completed a CLE course in timekeeping and record-keeping, and that she would therefore be unlikely to continue to make negligent or reckless errors.

(2) *The Board.*

The tension between the Hearing Committee's findings of fraudulent conduct and its proposed remedy, which is largely directed at defective bookkeeping practices, is even more pronounced in the Board's treatment of these issues. Indeed, in approving and analyzing the Committee's disposition, the Board, in our view, made findings which are difficult, if not impossible, to reconcile. We think that these apparent contradictions may bear significantly on the imposition of appropriate discipline.

On page 20 of its Report, the Board stated: "Bar Counsel has proven that, *inter alia,* Respondent charged for meetings that never took place. *She knew that these meetings never took place, yet she included them in her voucher.*" (Emphasis added.) Three pages later, the Board went further, finding that Respondent submitted "a *patently* fraudulent" voucher. (Emphasis added.) Nevertheless, on page 28 of its Report, in discussing the proposed sanction, the Board stated that it "agree[s] with Respondent that the Hearing Committee's findings *do not support a conclusion that she presented false evidence or testimony.*" (Emphasis added.) Indeed, wrote the Board, the Hearing Committee "*did not find that Respondent was deliberately dishonest in her defense of this matter,* and the Board will not assume that she

was when deciding the appropriate sanction for the underlying conduct." (Emphasis added.) The Board made these latter findings notwithstanding Respondent's testimony before the Hearing Committee that, *inter alia,* she and her investigator *did* visit the jail on February 15, 2002, and that she *did* confer with Whitley there. Thus, if Respondent did not in fact come to the jail on that occasion, and if the claim in her voucher that she did visit was a deliberate falsehood, then she necessarily also lied under oath at the hearing; it is hard to imagine that Respondent forgot that she did not go. Put another way, we do not understand how Respondent could both have

1. lied on her voucher when she sought compensation for a purported visit to the jail that did not really take place; but
2. not have lied under oath before the Hearing Committee when she testified that she did visit her client at the jail.

In recommending the discipline that this court should impose, the Board "agree[d] with the Committee that the core dishonesty of Respondent's conduct is the linchpin of an appropriate sanction in this matter." Nevertheless, like the Committee, the Board proposed a sanction under which, in order to be reinstated following a ninety-day suspension, Respondent would not be required to prove her ethical fitness to practice, *i.e.,* that she would not engage in fraud or dishonest conduct again. Instead, Respondent would have to complete a course designed to correct her negligent timekeeping practices.

## V.

### THE REMAND

Because we are unable to reconcile satisfactorily the Board's conclusion that Respondent submitted a "patently fraudulent voucher" with its position that the

Hearing Committee's findings "do not support the conclusion that she presented false evidence or testimony," we remand the case to the Board. We do so because, at least under the circumstances of this particular case, there may be a significant difference, for purposes of an appropriate sanction, between, on the one hand, deliberately fabricating a claim and perjuriously defending it before the Hearing Committee and, on the other hand, engaging, without intent to defraud, in record-keeping so shoddy, regardless of the consequences, that it is legally the equivalent of dishonesty, but then presenting a legitimate defense without demonstrable fabrication or perjury.[13]

Some, but not all, of the language in the Board's Report suggests that this case presents the first of these scenarios. However, the Board's conclusions

1. that because the Hearing Committee did not find that Respondent was deliberately dishonest in her testimony, the Board would not assume that she was; and

2. that a ninety-day suspension and the successful completion of a CLE course are sufficient to warrant reinstatement,

both tend to support the conclusion that the second scenario is what really occurred.

If the gravamen of Respondent's violation is that she was recklessly sloppy in her timekeeping practices, and if there has been no proof of intent to defraud or of subsequent perjury, a recommendation that a relatively short suspension be im-

---

**13.** Judge Glickman makes the sensible point that if, as the Hearing Committee and Board both found, Respondent deliberately included in her voucher a visit to the jail which she knew that she did not make, it is difficult to see how her conduct could have been reckless rather than deliberate. Indeed, we would not disagree with our colleague if the Committee and the Board had adhered consistently to that finding of deliberate fraud. As we have explained in this opinion, however, the Board's refusal, based on the Committee's Report, to find that Respondent lied in her own defense on the subject, *inter alia,* of her alleged visit to the jail, as well as the Board's proposal of a sanction focused primarily on improving Respondent's timekeeping skills, tend to compromise the "fraudulent voucher" finding and therefore require us to focus on potential differences between deliberate fraud and reckless timekeeping practices. To the extent, if any, that the Board on remand takes into account any reckless conduct, the Board should identify with specificity its precise nature and extent.

Our dissenting colleague also argues that "the distinction between actual knowledge and reckless disregard for the truth is without legal significance." He points out that reckless misappropriation of client funds, like intentional misappropriation, "calls for disbarment." *In re Anderson,* 778 A.2d 330, 338 (D.C.2001). Surely, however, this proves too much; willful and deliberate misappropriation is obviously more reprehensible than reckless conduct, though both kinds of misappropriation warrant disbarment. To use a common sense comparison, suppose that A, having drunk to excess, recklessly elects to drive his car and, as a result of his inebriated state, kills a pedestrian who turns out to be A's best friend. Suppose further that B, long having coveted the wife of his next-door neighbor and planned the neighbor's death, waits for the neighbor to leave his house and deliberately runs him down, crushing his limbs, causing and intending to cause an unbearably painful death. Both men's conduct merits severe punishment, but B's crime is indisputably worse than A's.

We do not at all countenance or minimize the culpability of reckless conduct committed with disregard of the consequences. Nevertheless, in the present case, the distinction between (1) deliberate fabrication with intent to steal from the public fisc, and (2) shoddy bookkeeping with reckless disregard for the accuracy of the voucher, could make a great deal of practical difference. A sanction focused on CLE may arguably bear some modest relation to the latter situation, but none at all to the former. Indeed, it is, in substantial part, the distinction between these two types of conduct that justifies the remand.

posed, with reinstatement conditioned on completion of the CLE course, may arguably be defensible, although our dissenting colleague argues, not at all implausibly, that the sanction is too lenient even on a "reckless sloppiness" hypothesis.[14] If, however, this is a case of a deliberately falsified claim for compensation for work not performed, with intent to defraud the public fisc, then the violations are far more serious, the attorney's character and fitness to practice law are called into serious question, and the sanction proposed by the Board is not commensurate with the violation.[15] This is especially true if the initial fraud in preparing and submitting to the voucher was compounded by false testimony before the Hearing Committee designed to protect and perpetuate the de-

ception. As noted by the Board, "[a]n attorney who presents false testimony during disciplinary proceedings clearly does not appreciate the impropriety of his or her conduct. *See In re Goffe*, 641 A.2d 458 (D.C.1994)." Moreover, lying under oath on the part of an attorney for the purpose of attempting to cover up previous dishonest conduct is absolutely intolerable; "[t]he Bar[, after all,] is a noble calling." *In re Shillaire*, 549 A.2d 336, 337 (D.C.1988) (*Shillaire I*).

▋ In sentencing a criminal defendant, the judge may legitimately include in his or her calculus any willful or material falsehoods told by the defendant while testifying at trial. *United States v. Grayson*, 438 U.S. 41, 50–54, 98 S.Ct. 2610, 57

14. We cannot agree with Judge Glickman, however, that Respondent should be disbarred forthwith, with no further inquiry. A *unanimous* Board, adopting the recommendation of a *unanimous* Hearing Committee, has not only declined to find that Respondent's testimony was false, but has proposed discipline apparently designed to address inept record-keeping (rather than deliberate dishonesty) on the part of the Respondent. Moreover, the Hearing Committee found, and the Board apparently agrees, that there is nothing in the record that reflects adversely on her present qualifications to practice law, a finding which is surely in tension with the earlier finding that she deliberately swore to and filed a false voucher. What the Board and the Hearing Committee did (*i.e.*, recommended) appears to be at odds with what they said, and suggests a level of discomfort with the finding that Respondent submitted a fraudulent voucher, or, at least, with the logical consequences of that finding. To order disbarment before these apparent inconsistencies have been sorted out would, in our view, be at least premature.

Moreover, in proposing immediate disbarment, Judge Glickman finds himself in disagreement not only with all of the members of the Hearing Committee (which had the opportunity to observe Respondent), with all of the members of the Board, and with a majority of the court, but also with the present

position of Bar Counsel, who now proposes a year's suspension with reinstatement conditioned on proof of fitness. Our disciplinary system is adversarial—Bar Counsel prosecutes and Respondent's attorney defends—and although the court is not precluded from imposing a more severe sanction than that proposed by the prosecuting authority, that is and surely should be the exception, not the norm, in a jurisdiction, like ours, in which Bar Counsel conscientiously and vigorously enforces the Rules of Professional Conduct.

15. *See In re Dyer*, 750 So.2d 942 (La.1999) (attorney disbarred for, *inter alia*, billing for services not performed and inflating charges for other services; court disbelieved attorney's testimony that overcharges were honest errors; however, the conduct in *Dyer* was significantly more extreme than that of Respondent in this case); *In re LeRose*, 182 Wis.2d 595, 514 N.W.2d 412 (1994) (attorney disbarred for, *inter alia*, submitting voucher to State Public Defender seeking compensation for work not in fact performed; attorney subsequently lied to cover up the deception; as in *In re Dyer*, the attorney's overall misconduct was more extreme than Respondent's ethical violations in this case). Further, although the misconduct in this case does not involve misappropriation of *client* funds, there are obvious similarities between the two situations.

L.Ed.2d 582 (1978).[16] The same principle surely applies, *a fortiori*, to a disciplinary proceeding in which the individual charged with ethical violations is not an ordinary citizen, but a member of an honorable profession charged with upholding the rule of law. If Bar Counsel proved that Respondent testified falsely, then this is a significant aggravating factor. If, on the other hand, such proof was lacking, then this aggravating circumstance is eliminated from the calculus, and the initial finding of deliberate fabrication stands on a significantly less firm footing.

## VI.

### EXPEDITION

Respondent was appointed to represent Whitley in February 2002. She, and indeed all concerned, are entitled to as prompt as possible a resolution of this controversy. We recognize, in that connection, that a remand will unfortunately result in further delay. Given our analysis of the case, however, a remand is the most appropriate and logical disposition. We express the hope that the case will be acted upon as expeditiously as possible by all concerned.

## VII.

### CONCLUSION

For the foregoing reasons, the case is remanded to the Board on Professional Responsibility for revised findings and a new recommendation, consistent with this opinion, regarding the appropriate sanction.

*So ordered.*[17]

GLICKMAN, Associate Judge, dissenting in part:

Upon clear and convincing evidence, the Board on Professional Responsibility has found that Respondent Karen Cleaver–Bascombe knowingly billed the Superior Court for services that she had not performed. "Bar Counsel," the Board reports, "proved that Respondent's voucher was fraudulent." Further, the Board accepted the Hearing Committee's determination that "Respondent's testimony was unsupported by the evidence and not credible." Given these unequivocal conclusions, I disagree with my colleagues' decision to remand this case for the Board to clarify and amplify its findings. I do not think a remand is desirable merely because the Board was reluctant to draw the additional conclusion, unnecessary to its (or our) decision, that Respondent also committed perjury before the Hearing Committee. Neither should we remand merely because we deem the Board's recommended sanction to be ill-considered and too lenient.

Instead, I think we should reject the Board's sanction recommendation and order that Respondent be disbarred for her misconduct. (I am in full agreement with my colleagues that Respondent committed each of the ethical violations with which she was charged.) In terms of the nature and gravity of her misconduct and its import for evaluating her character and fit-

---

16. "A defendant's truthfulness or mendacity while testifying on his own behalf, almost without exception, has been deemed probative of his attitudes toward society and prospects of rehabilitation and hence relevant to sentencing." *Grayson,* 438 U.S. at 50, 98 S.Ct. 2610.

17. Judge Schwelb would direct that, on remand, the Board make findings as to whether Respondent performed significant legal work on Whitley's behalf for which she did not request compensation on her voucher. A majority of the court, however, disagrees with this proposal.

ness to practice law, Respondent's submission of what the Board has found was "a patently fraudulent" voucher is no less egregious than other misbehavior for which disbarment is virtually automatic, including misappropriation of client funds, *In re Addams,* 579 A.2d 190, 191 (D.C. 1990) (en banc); mail or wire fraud, *In re Bond,* 519 A.2d 165, 166 (D.C.1986); felony theft of federal funds, *In re Patterson,* 833 A.2d 493 (D.C.2003); and other felony theft offenses, *see id.* (citing cases). It is immaterial, and certainly not mitigating, that Respondent has not been criminally convicted and that—due entirely to the exceptional alertness of the Superior Court judge who reviewed her voucher—her attempt to defraud the public fisc was blocked.

To be sure, in determining the appropriate sanction to impose on an errant attorney, we consider other factors in addition to the nature of the ethical violations. We also consider any mitigating or aggravating circumstances; the need to protect the public, the courts, and the legal profession; and the moral fitness of the attorney to the extent we can discern it. *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc). Importantly, too, for this case, we keep in mind that one purpose of discipline is "to deter other attorneys from engaging in similar misconduct." *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc). None of these other considerations can be said to ameliorate the presumptively appropriate sanction (disbarment) here. General deterrence is of especial concern in this case. In the interest of effective general deterrence, the severity of a sanction should take into account the difficulty of detecting and proving the misconduct at issue. That principle argues strongly in favor of disbarring Respondent, because inflated vouchers are difficult to detect and prove. To deter unscrupulous attorneys who know they are not likely to be caught

if they inflate their charges, voucher fraud must incur a heavy penalty.

My colleagues are uncertain whether Respondent actually knew that her voucher was false but agree that she "at the minimum, submitted a voucher with reckless disregard for the truth of its contents." *Ante* at 405. The remand is for the Board to clarify its findings on this point. I do not profess to understand how the distinction that my colleagues draw could be thought to apply to this case; Respondent unquestionably knew what she stated under oath in her voucher, and if she in fact never met with her client at the District of Columbia Jail, she surely knew that she did not do so. (And it beggars belief to imagine that Respondent was simply forgetful or was confused; certainly my colleagues do not indulge in such fancies.) Needless to add, any suggestion that Respondent was "merely" reckless (let alone honestly mistaken) is contrary not only to the express findings of the Hearing Committee and the Board, but also to Respondent's own position. Respondent has not claimed that her voucher was anything but true.

More important, the distinction between actual knowledge and reckless disregard for the truth is without legal significance in the present context. Reckless disregard is not like mere sloppiness, poor record keeping, or other negligent error. Recklessness is a culpable mental state tantamount to actual knowledge and intent. Reckless misappropriation of client funds, for example, calls for disbarment the same as if it were intentional. *In re Anderson,* 778 A.2d 330, 338 (D.C.2001). Similarly, even if it plausibly could be maintained that Respondent "merely" submitted her false and inflated voucher with reckless disregard for whether it was true, she merits disbarment all the same. Thus, remanding for the Board to clarify whether it has

found intentionality as opposed to recklessness is a pointless exercise. The implication that this court thinks otherwise—that we view reckless disregard for the truth as less culpable for attorney discipline purposes than knowing falsehood—is contrary to precedent and deeply troubling. I do not agree with that viewpoint.[1]

Lastly, I think it inappropriate to remand for the Board to address Respondent's testimony that she performed significant legal work for which she did not seek compensation on her voucher. *See ante* at 413 n. 17. The premise that Respondent's performance of such work might mitigate her fraud and justify a lesser sanction is legally dubious. Public funding of indigent defense depends on accurate reporting that enables the judge to scrutinize the work that a lawyer did in order to decide whether, and if so to what extent, the lawyer should be compensated for it. Material misrepresentation of the work performed, even if the number of hours listed is not exaggerated, thwarts such essential judicial oversight by precluding meaningful scrutiny. A lawyer who, intentionally or recklessly, submits a voucher to get paid for work she did not do therefore commits (or attempts) a monetary fraud on the court even if the lawyer could have requested the court to consider awarding the same total amount of compensation for the work she actually performed. It therefore is hard to see why Respondent's putative evasion of mandatory judicial scrutiny and oversight of her actual work in order to get paid might deserve a lesser sanction. But I need not dwell on that question (which the parties have not briefed or argued). Respondent did not make, and thus she has waived, any claim

that other work entitled her to the compensation she improperly sought; consequently, Respondent has waived any claim that this possible entitlement to equivalent compensation justifies a lesser sanction. Even if Respondent had not waived the claim, the evidence she produced on the point consisted only of her vague and uncorroborated testimony, which is quoted in the majority opinion, *ante* at 408. This testimony fell well short of demonstrating an entitlement to equivalent compensation. And even if Respondent had made the claim and testified adequately in support of it, the Hearing Committee and the Board already have found Respondent to be a witness unworthy of belief.

For the foregoing reasons, I respectfully dissent from my colleagues' decision to remand this case.

---

1. I disagree, in particular, with my colleagues' statement that "[i]f the gravamen of Respondent's violation is that she was recklessly sloppy in her timekeeping practices, and if there has been no proof of intent to defraud or of subsequent perjury, a recommendation that a relatively short suspension be imposed, with reinstatement conditioned on completion of the CLE course, may arguably be defensible.....'' *Ante* at 411–12.